John **LAURO, Jr.**, Plaintiff–Appellee,

v.

Michael **CHARLES**, Defendant–Appellant,

**The City of New York and The Police Department of the City of New York, Defendants.**

**Docket No. 99–7239**

United States Court of Appeals, Second Circuit.

Argued: Feb. 10, 2000

Decided: July 28, 2000

Philip J. Dinhofer, New York, NY, for Plaintiff–Appellee.

Edward F.X. Hart, Office of the Corporation Counsel of the City of New York, New York, N.Y. (Michael D. Hess, Corporation Counsel of the City of New York, Leonard Koerner, and Orrit Hershkovitz, on the brief) for Defendant–Appellant.

Nathan E. Siegel, ABC, Inc., New York, NY, submitted a brief on behalf of amici curiae ABC, Inc., Associated Press, CBS Broadcasting Inc., The Daily News, National Broadcasting Company, Inc., NYP Holdings, Inc., Reporters Committee for Freedom of the Press, Tribune Broadcasting Company, and The Washington Post Company.

Before: MESKILL, WALKER, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

May the police constitutionally force an arrested person to undergo a staged "perp walk" for the benefit of the press, when the walk serves no other law enforcement purpose? We hold that such a staged perp walk exacerbates the seizure of the arrestee unreasonably and therefore violates the Fourth Amendment. But we also hold that, because the Fourth Amendment right at issue was not clearly established until today's decision, the defendant police officer in this case is entitled to qualified immunity.

I

The "perp walk"—as it is popularly known—is a widespread police practice in New York City in which the suspected perpetrator of a crime, after being arrested, is "walked" in front of the press so that he can be photographed or filmed. *See* Benjamin Weiser, *Judge Condemns Policy of Parading Suspects Past Cameras,* N.Y. Times, Feb. 26, 1999, at B1. The perp walk both publicizes the police's crime-fighting efforts and provides the press with a dramatic illustration to accompany stories about the arrest. *See id.* Not surprising-

ly, then, police and press often cooperate to ensure that perp walks occur. But while the walks arguably benefit both the police and the media, their effect on the "walked" suspects can be less benign. Although a perp walk commonly occurs before any judicial determination that a suspect has actually committed the crime for which he was arrested, or even that there is enough evidence to justify a trial, a suspect in handcuffs being led into a station house is a powerful image of guilt. Indeed, the perp walk has been described as "a ritual degradation that publicly signals [the arrestee's] change in status from an ordinary citizen." John Tierney, *The Big City: Even Perps May Prefer Walk of Fame*, N.Y. Times, Mar. 1, 1999, at B1 (quoting Prof. David Kertzer) (internal quotation marks omitted).

Perp walks come in several varieties. *See generally* Blaine Harden, *Parading of Suspects is Evolving Tradition*, N.Y. Times, Feb. 27, 1999, at B1 (discussing the history of the perp walk in New York City). Commonly, the arrestee is filmed while in the normal course of being transferred by the police from one location to another. In such cases, the police may or may not notify the press that the arrestee will be moved, and is thus available for photographing, at a particular time. *See id.* These walks are very different from staged perp walks. In a staged walk, the police take the suspect outside the station house, at the request of the press, for no reason other than to allow him to be photographed. The perp walk to which the plaintiff here was subjected was of this sort.

John Lauro, the plaintiff in this case, was a doorman at an Upper East Side apartment building, where Matthew Eberhart was a tenant. Eberhart, who was going on vacation, asked Lauro to deliver his mail and water his plants while Eberhart was away. Eberhart gave Lauro

written authorization to enter the apartment for that purpose, and gave him the keys. Just before leaving, however, Eberhart spoke to Paul Molnar, the building superintendent, who told him that Lauro was suspected of committing thefts in the building. Eberhart decided to place a wireless camera in his bedroom; the camera transmitted to a television monitor in Molnar's apartment, and was there connected to a video cassette recorder. When Eberhart returned from vacation, he and Molnar viewed the resulting videotape. It showed Lauro entering the Eberharts' bedroom several times and opening dresser drawers and cabinets. The video did not show Lauro stealing anything, and Eberhart did not find anything missing from the apartment. *See Lauro v. City of New York*, 39 F.Supp.2d 351, 354–56 (S.D.N.Y.1999).

Eberhart contacted various TV stations to see if they were interested in broadcasting the videotape, and Fox 5 News eventually purchased the tape for $200. Eberhart then called the police and filed a complaint against Lauro. After being persuaded by detectives to accompany them from his home in New Jersey to New York, Lauro was arrested by the defendant, Detective Michael Charles, and charged with burglary, petit larceny, and possession of stolen property.[1] *See id.* at 356–57.

About two hours after Lauro was brought to the precinct squad room by Detective Charles, Charles received a telephone call from the Police Department's Office of the Deputy Commissioner of Public Information ("DCPI") telling him that the media were interested in Lauro's case and that Lauro should be taken on a perp walk. Charles handcuffed Lauro and walked him out the front door and outside the station house. He then placed Lauro in an unmarked police car, drove around the block, removed Lauro from the car,

---

1. The criminal proceeding was ultimately adjourned in contemplation of dismissal, and Lauro was ordered to perform one day of community service; the charges were later dismissed. *See Lauro,* 39 F.Supp.2d at 366 & n. 12.

and walked him back into the station house. The perp walk was filmed by a television crew from Fox 5 News, and footage of the walk, along with excerpts from the videotape made by Eberhart, was subsequently broadcast by Fox 5 News. *See id.* at 357.

Lauro brought suit against Charles, the City of New York, and the Police Department[2] under 42 U.S.C. § 1983, alleging violations of the Fourth Amendment, the Sixth Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment, as well as numerous violations of New York state law, stemming from his arrest and from the perp walk. The defendants moved for summary judgment, and Lauro cross-moved for partial summary judgment on the issue of liability.

The district court granted defendants' motion in part[3] and granted Lauro's motion in part. It held that Lauro was entitled to partial summary judgment on liability because "[t]he perp walk conducted with plaintiff was a seizure that intruded on plaintiff's privacy interests and personal rights, and was conducted in a manner designed to cause humiliation to plaintiff with no legitimate law enforcement objective or justification," and therefore was unreasonable as a matter of law under the Fourth Amendment. *Id.* at 363. The Fourth Amendment was implicated, the court found, for two reasons. "First, plaintiff's control over his own body was curtailed significantly as he was handcuffed and paraded outside of the precinct." *Id.* Second, "intangibles such as plaintiff's own image and the sound of his voice were also seized . . . in a manner that implicates the Fourth Amendment." *Id.* Moreover, the court held that these actions were unreasonable, since the defendants had not advanced any legitimate law enforcement justification for the perp walk, which "had the effect only of humiliating plaintiff, assisting the media in sensationalizing the facts of his case, and allowing Det. Charles to appear on television." *Id.* at 364. Accordingly, the court concluded, the Fourth Amendment had been violated. *See id.* at 365.

The court also held that Detective Charles was not entitled to qualified immunity. It noted that "there is no reported decision that expressly forbids the use of perp walks." *Id.* at 368. Nevertheless, it found that the decision of this court in *Ayeni v. Mottola,* 35 F.3d 680 (2d Cir. 1994), which held that the presence of the media at a search of a private home violated the Fourth Amendment, *see id.* at 683, clearly established "that making use of state resources and police force solely to

**2.** The district court dismissed the claims against the Police Department because, as a City agency, it is not a suable entity. *See id.* at 368 (citing N.Y. City Charter § 396).

**3.** The district court granted summary judgment to defendants on all of Lauro's claims, other than his allegation that the perp walk violated his Fourth Amendment and Fourteenth Amendment rights. (It did not reach or consider Lauro's Fourteenth Amendment claims. *Lauro,* 39 F.Supp.2d at 365 n. 10.) The court held that (1) no Fourth Amendment violation occurred when Lauro was persuaded to accompany Detective Charles to New York from his home in New Jersey, because he voluntarily went with Charles to New York, *see id.* at 358–61; (2) his arrest in New York was not unlawful, as Charles had probable cause, based on the videotape, to arrest

him for attempted petit larceny, *see id.* at 361–62; (3) Lauro's Sixth Amendment rights were not violated by any delay in explaining to Lauro the nature of the charges against him, *see id.* at 362; (4) no violation of the Eighth Amendment occurred, because the perp walk was not cruel and unusual punishment, *see id.* at 365–66; (5) Lauro could not make out a claim of malicious prosecution under either federal or state law, since an adjournment in contemplation of dismissal is not considered a favorable disposition of a criminal charge for the purpose of a malicious prosecution claim, *see id.* at 366; and (6) Lauro's other state claims must be dismissed because Lauro had not filed a notice of claim as required by New York law, *see id.* at 368–69. None of these rulings is before us on this interlocutory appeal.

aid the press in sensationalizing and humiliating a criminal suspect at the expense of the suspect's privacy rights, without any legitimate law enforcement interest, is constitutionally unacceptable." *Lauro*, 39 F.Supp.2d at 368. The court therefore denied Detective Charles's motion for summary judgment as to the Fourth Amendment claim arising out of the perp walk. *See id.* at 369.[4]

Detective Charles now appeals.

## II

■ Because Detective Charles seeks review of the district court's denial of his assertion of qualified immunity, and because only questions of law are involved, we have jurisdiction under the collateral order doctrine to hear Charles's appeal. *See Cartier v. Lussier*, 955 F.2d 841, 844 (2d Cir.1992). We review the district court's denial of summary judgment *de novo*. *See Martinez v. Simonetti*, 202 F.3d 625, 631 (2d Cir.2000).

The Supreme Court has instructed that, in reviewing a district court's grant or denial of summary judgment to a defendant on qualified immunity grounds, "the better approach ... is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see also Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The Court noted that "the generally sound rule of avoiding determination of constitutional issues" loses its applicability in such

cases because resolution of the qualified immunity issue necessarily requires some inquiry into the state of constitutional law at the time of the challenged action. *Sacramento*, 523 U.S. at 841 n. 5, 118 S.Ct. 1708. Moreover, if the policy of avoidance were followed in qualified immunity cases, "standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." *Id.*

Accordingly, we first decide whether the perp walk violated a right granted Lauro by the Fourth Amendment, and only subsequently consider whether Detective Charles is entitled to qualified immunity, given the state of the law when he staged the perp walk.

## A

On appeal, Charles contends that the district court, in finding that the perp walk violated the Fourth Amendment, ignored or misapplied relevant precedent from this court and from the Supreme Court. He argues that Lauro's claim is most closely analogous to that raised, and rejected by the Supreme Court, in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), which held that an individual's interest in his reputation is not—without more—a protectible liberty or property interest within the meaning of the Due Process Clause of the Fourteenth Amendment, and that the circulation of photographs of an arrested person did not violate any substantive privacy right protected by that clause. Charles also relies on this court's decision in *Rosenberg v. Martin*, 478 F.2d 520 (2d Cir.1973), which held that a § 1983 plaintiff had failed to make out a claim that his substantive due process right to privacy was violated by

4. The district court also found that the evidence established a City custom or policy of conducting perp walks, and ruled that the City was therefore liable to Lauro under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which held that a plaintiff could make out a § 1983 claim against a municipality by showing the existence of a municipal policy or custom of violating constitutional rights, *see id.* at 694, 98 S.Ct. 2018. *See Lauro*, 39 F.Supp.2d at 366–67. Because the City cannot raise the defense of qualified immunity, *see Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the district court's finding of *Monell* liability is not before us on this interlocutory appeal.

inflammatory and prejudicial publicity stemming from his perp walk. We conclude that, although the facts of *Paul,* and more particularly the facts of *Rosenberg,* are in some respects similar to the facts Lauro alleges, those decisions do not govern this case.

In *Paul,* police circulated to local merchants a flyer bearing the names and photographs of "active shoplifters," which included persons, like plaintiff, arrested for shoplifting but not convicted. *Paul,* 424 U.S. at 695–96, 96 S.Ct. 1155. Plaintiff brought a § 1983 suit alleging deprivation of his Fourteenth Amendment right to due process and of his constitutional right to privacy. *See id.* at 697, 712, 96 S.Ct. 1155. In support of his due process claim, plaintiff argued that the "active shoplifter" label would inhibit him from entering stores in the area and would impair his future employment opportunities, thus depriving him of liberty. *See id.* at 697, 96 S.Ct. 1155. The Supreme Court rejected plaintiff's contention. It found that his due process claim was in essence an action for defamation, for which state law, and not § 1983, should provide the remedy. *See id.* at 699–701, 96 S.Ct. 1155. The Court concluded that, in the absence of any contention that a more specific constitutional provision had been infringed, allowing such a cause of action to be brought under § 1983 would mean that the Fourteenth Amendment provided protection against all torts committed by the state, and would entail the development of "a body of general federal tort law." *Id.* at 701, 96 S.Ct. 1155. More specifically, the Court held that there is no constitutionally protected liberty interest in the preservation of one's reputation, absent some further injury to a tangible interest such as employment, because damage to one's reputation does not "alter[ ] or extinguish[ ]" "a right or status previously recognized by state law." *Id.* at 711, 96 S.Ct. 1155.

Finally, the Court briefly disposed of plaintiff's claim that the circulation of the flyer violated his "right to privacy guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments." *Id.* at 712, 96 S.Ct. 1155 (internal quotation marks omitted). In so doing, the Court noted:

"[Z]ones of privacy" may be created by more specific constitutional guarantees and thereby impose limits upon government power. Respondent's case, however, comes within none of these areas. He does not seek to suppress evidence seized in the course of an unreasonable search. And our other "right of privacy" cases, while defying categorical description, deal generally with substantive aspects of the Fourteenth Amendment. In *Roe* the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are "fundamental" or "implicit in the concept of ordered liberty".... The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

Respondent's claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere intended to be "private," but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.

*Id.* at 712–13, 96 S.Ct. 1155 (citations omitted).

It should be clear from the Court's language that the legal doctrines implicated by *Paul* and by the instant case are quite

different. Lauro asserts, and the district court held, that the perp walk to which he was subjected constituted an unreasonable seizure, in violation of the Fourth Amendment. The plaintiff in *Paul* made no analogous claim. Accordingly, the *Paul* Court made no holding premised on the Fourth Amendment. Rather, the Court emphasized that it was concerned with limiting the potentially enormous scope of the Due Process Clause, and that no part of its holdings applied when a violation of a more particularized constitutional provision was alleged. Indeed, the Court specifically distinguished cases in which an infringement of the Fourth Amendment had been claimed. In doing so, it recognized that the protections of the Fourth Amendment have long been made applicable to the states, and that, as a result, a § 1983 suit against state officials for violating the Fourth Amendment raised none of the federalism concerns that troubled the Court and that would arise when a state-law tort such as defamation was alleged also to violate the Fourteenth Amendment. *See id.* at 700, 96 S.Ct. 1155 (noting that plaintiff "has pointed to no specific constitutional guarantee [such as the Fourth Amendment] safeguarding the interest he asserts has been invaded"). The *Paul* Court explicitly noted that the Fourth Amendment creates a zone of privacy "impos[ing] limits upon government power," *id.* at 713, 96 S.Ct. 1155, but it went on to distinguish plaintiff's claim as one that lay outside the protections of the Fourth Amendment, *see id.* ("[Plaintiff] does not seek to suppress evidence seized in the course of an unreasonable search.").

Subsequent Supreme Court decisions have held that where a claim can be characterized as a violation of the Fourth Amendment, it should be analyzed as such, and not as a substantive due process claim. *See Sacramento*, 523 U.S. at 842, 118 S.Ct. 1708 ("[W]here a particular Amendment provides an explicit textual source of con-

stitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (quoting *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (internal quotation marks omitted)). Because, as we discuss below, we believe that the perp walk to which Lauro was subjected is best viewed as an exacerbation of the seizure that occurred when he was arrested, his claim is properly analyzed under the Fourth Amendment.[5]

Charles, and amici, also rely on a case from this court, *Rosenberg*, which rejected claims by a § 1983 plaintiff arising out of a perp walk. *See Rosenberg*, 478 F.2d at 526. They contend that *Rosenberg* stands for the proposition that news photography of an arrestee cannot violate any privacy interest. Charles's conception of the principle for which *Rosenberg* stands is, however, overly broad.

In *Rosenberg*, the plaintiff's complaint charged that the defendant police officer had caused him to be convicted of murder by deliberately giving false information to the media and creating inflammatory and prejudicial publicity. *See id.* at 522. Judge Friendly analyzed Rosenberg's claim of prejudicial publicity as relying upon, *inter alia*, "the recently evolved and not yet clearly defined right to privacy." *Id.* at 524. He reasoned that "[e]xposure of the self to others in varying degrees is a concomitant of life in a civilized community," *id.* (quoting *Time, Inc. v. Hill*, 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967)) (internal quotation marks omitted), and concluded that the publication of charges of criminal conduct, on the facts before him, could not support a cause of action for violation of a substantive due

---

5. While Lauro's complaint also asserted a violation of the Due Process Clause, the district court did not rule on that argument, and we do not consider it. *See Lauro*, 39 F.Supp.2d at 358, 365 n. 10.

process right to privacy under § 1983, *see id.* at 525.

*Rosenberg* cannot govern our analysis for essentially the same reasons that *Paul* cannot. As in *Paul,* the plaintiff in *Rosenberg* did not frame his claim as one under the Fourth Amendment. Accordingly, Judge Friendly did not analyze its possible implications under that amendment. Rather, like the *Paul* Court, he examined Rosenberg's privacy claim in light of the line of cases that dealt with reproductive rights and that established a "right to privacy" that was not tied to any specific constitutional provision. In noting that "only the most intimate phases of personal life have been held to be thus constitutionally protected," *Rosenberg.* 478 F.2d at 524–25, the *Rosenberg* court cited *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). *See Rosenberg,* 478 F.2d at 525. And, not surprisingly, it evidenced a reluctance to extend the boundaries of such a "penumbral" right to privacy.

The dimensions of the privacy rights established by the Fourth Amendment are, however, quite different. They are both more specific and less absolute than the generic notions invoked in *Griswold* and its progeny. Thus, a Fourth Amendment examination of a search or seizure like the one in this case requires a contextualized reasonableness analysis that seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the state. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Cases involving unspecified substantive due process privacy rights instead focus on areas where privacy is "implicit in the concept of ordered liberty," *Paul,* 424 U.S. at 713, 96 S.Ct. 1155 (quoting *Roe,* 410 U.S. at 152, 93 S.Ct. 705) (internal quotation marks omitted), and within which the government cannot regulate at all, absent a compelling interest. *See Roe,* 410 U.S. at 155, 93 S.Ct. 705.

It is not, therefore, surprising that the protections accorded by the Fourth Amendment, precisely because they are, as a general matter, less absolute than the substantive guarantees of the Due Process Clause, implicate and control a wider spectrum of law enforcement activity than the latter. As a result, even assuming that an arrestee can assert no violations of a substantive due process right to privacy stemming from police actions, it does not follow that those same actions may not be invalid under the Fourth Amendment's reasonableness requirement. Hence, cases delineating the scope of the substantive right to privacy do not control a Fourth Amendment analysis.

## B

Accordingly, and following the mandate of the Supreme Court in *Sacramento,* we turn to the question of whether Lauro's perp walk violated his Fourth Amendment rights.

■ Lauro's Fourth Amendment challenge to the perp walk may seem, in some respects, to be a case of first impression. That is, we have not previously considered whether acts by the police such as those that took place here amount to an unreasonable seizure. We do know, however, that the Fourth Amendment's proscription of unreasonable searches and seizures "not only ... prevent[s] searches and seizures that would be unreasonable if conducted at all, but also ... ensure[s] reasonableness in the manner and scope of searches and seizures that are carried out." *Ayeni,* 35 F.3d at 684; *see also Graham,* 490 U.S. at 395, 109 S.Ct. 1865 ("[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out.") (citation omitted). We must, as a result, examine whether what occurred in this case constitutes an improper exacerbation of an otherwise lawful seizure. And, in fact, both this court and

the Supreme Court have addressed a quite similar question, when they considered whether police facilitation of press photography, during an otherwise lawful search of a private home, rendered that search unreasonable. *See Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818; *Ayeni v. Mottola,* 35 F.3d 680. We believe that the decisions in *Wilson* and *Ayeni* are the closest available analogues to the question presented to us today.

In *Ayeni,* the Secret Service obtained a search warrant for the Ayenis' house based on information that Babatunde Ayeni had engaged in credit card fraud. *See id.* at 683. When Secret Service agents arrived to search the house, together with a CBS television crew, only Ayeni's wife and young son were home. *See id.* The CBS crew videotaped Mrs. Ayeni and her son without their consent while they were being questioned about the accusations of fraud. *See id.* at 683–84. They also videotaped the Secret Service agents searching the Ayenis' home and their personal effects. *See id.* The Ayenis brought suit against the agents, claiming, *inter alia,* (1) that their "privacy was invaded by the presence of unauthorized persons in their home," and (2) that "the conduct of the search was excessively intrusive." *Id.* at 684.

With respect to the Ayenis' first claim, we held that, as a matter of law, the agents' actions violated the Fourth Amendment, because the presence of the television crew both exceeded the scope of the search warrant given to the Secret Service and lacked any legitimate law enforcement justification. *See id.* at 686. With respect to the Ayenis' second allegation—that "the search was conducted in an unreasonably intrusive manner"—we ruled that the Ayenis were entitled to have that claim considered by a jury. *Id.* at 689. We explained:

> The video and sound recordings were unnecessary to the purposes of the search—to discover material related to an alleged credit card fraud scheme. The Government makes no claim that the search was being videotaped for legitimate law enforcement purposes.... Instead, the purpose of the TV crew's intrusion into the Ayeni home was to seize images and sounds of the Ayeni home, and of the Ayenis themselves, that were intended for public viewing by television audiences across the country. We agree with the District Court that the video and sound recordings were "seizures" under the Fourth Amendment, and rendered the search far more intrusive than it needed to be.

*Id.* at 688.

Recently, in *Wilson v. Layne,* the Supreme Court confirmed the validity of *Ayeni*'s first holding when it unanimously ruled that a media ride-along during the execution of an arrest warrant in a private home violated the Fourth Amendment. *See Wilson,* 526 U.S. at 605, 119 S.Ct. 1692. The *Wilson* Court noted that "[t]he Fourth Amendment embodies [a] centuries-old principle of respect for the privacy of the home," *id.* at 610, 119 S.Ct. 1692, and that, because of the paramount importance accorded that privacy, "police actions in execution of a warrant [must] be related to the objectives of the authorized intrusion," *id.* at 611, 119 S.Ct. 1692. The Court found that the presence of reporters in the Wilsons' home was not related to the objectives of the arrest, and rejected defendants' arguments that it nevertheless served legitimate police purposes. *See id.* at 612–14. *Wilson* relied principally on the notion that execution of a warrant in a private home must be strictly limited to actions that further the objectives of the warrant. For the *Wilson* Court, it was the unnecessary presence of reporters in the Wilsons' home (and not the photographs taken of the Wilsons) that triggered the Fourth Amendment violation.[6] Consequently, *Wilson* did not address *Ayeni*'s

---

6. That is not to say that the *Wilson* Court found the photographing of the Wilsons to have no constitutional significance. It simply did not consider that question.

second holding—that a jury could find that the videotaping of the Ayenis rendered the search overly intrusive.

▪ Nevertheless, *Wilson*—like *Ayeni*—stands for two important Fourth Amendment principles. One, "[t]he reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out." *Ayeni*, 35 F.3d at 684. Two, the reasonableness of the police's actions in conducting a search or seizure must be judged, in part, through an assessment of the degree to which those actions further the legitimate law enforcement purposes behind the search or seizure. *See Wilson*, 526 U.S. at 611, 119 S.Ct. 1692 (quoting *Maryland v. Garrison*, 480 U.S. 79, 87, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) ("[T]he purposes justifying a police search strictly limit the permissible extent of the search.")); *Ayeni*, 35 F.3d at 685–86.

Bearing these principles in mind, we must ask two questions of the case before us. First, did the perp walk intrude upon interests protected by the Fourth Amendment? Second, if it did, was it nevertheless reasonable in light of legitimate law enforcement purposes?

## 1

Charles contends that there was no invasion of Fourth Amendment interests in this case because Lauro's perp walk, unlike the searches in *Ayeni* and *Wilson*, each of which involved a search of a private home, occurred in a situation in which Lauro had no reasonable expectation of privacy. Accordingly, he claims that there is no need to analyze whether the perp walk was reasonable.

Charles is correct that both *Ayeni* and *Wilson* emphasized the sanctity of the private home, and the particular gravity the Fourth Amendment accords to government intrusions on that privacy. *See Wil-son*, 526 U.S. at 612, 119 S.Ct. 1692; *Ayeni*, 35 F.3d at 685. It is not the case, however, that the holdings in *Ayeni* and *Wilson* turned solely on the special status of the home, or that the Fourth Amendment's privacy protections end at the door of one's house. Our court recognized, rather, that the privacy interests threatened in *Ayeni* went beyond those that attach to the inviolability of the home, and concluded that obtaining and broadcasting images of the Ayenis in a humiliating situation itself infringed on their Fourth Amendment privacy rights. *See id.* at 685, 688. In doing so, *Ayeni* was consistent with long-standing Fourth Amendment jurisprudence, which has declined to set spatial boundaries on the rights protected by that amendment. For, as the Supreme Court has famously stated, "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

This is not to say that the place where police conduct occurs is irrelevant to our analysis of whether that conduct violates a privacy right under the Fourth Amendment. Far from it. But it cannot be determinative. As the Supreme Court has explained, "[W]herever an individual may harbor a reasonable 'expectation of privacy,' he is entitled to be free from unreasonable governmental intrusion. Of course, the specific content and incidents of this right must be shaped by the context in which it is asserted.... The question is whether in all the circumstances ..., his right to personal security was violated by an unreasonable search and seizure." *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citation omitted). Thus, in applying those principles to a "stop and frisk" of a person on a public street, the *Terry* Court recognized the significant intrusion upon dignitary and privacy interests that occurs when a person is physically handled by the police, and commented that "such a procedure performed in public by a policeman while the citizen stands helpless ... is a serious intrusion

upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." *Id.* at 16–17, 88 S.Ct. 1868.

█ Nor are these ·protections inapplicable to persons lawfully in police custody. Rather, the Fourth Amendment shields arrestees from police conduct that unreasonably aggravates the intrusion on privacy properly occasioned by the initial seizure. *See, e.g., Albright v. Oliver,* 510 U.S. 266, 277–279, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, *J.,* concurring) (noting that a seizure continues throughout pretrial detention, and that actions by the police that unreasonably perpetuate that seizure can violate the Fourth Amendment); *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986) (holding that a strip search of a misdemeanor arrestee, absent reasonable suspicion of concealed weapons or contraband, violated the Fourth Amendment).

In the instant case, Lauro was physically restrained, by handcuffs and by the grip of Detective Charles on his arm. In that humiliating position, he was made to walk outside the precinct house, was driven around the block, and was then forced to walk back into the precinct house, in front of television cameras. The fact that Lauro was lawfully under arrest when these events occurred does not mean that no Fourth Amendment interest of Lauro's was implicated. Regardless of whether the seizure is viewed as (1) a separate seizure that occurred when Lauro was forcibly removed from the station and brought back in, or (2) a continuation and aggravation of the seizure that occurred when he was arrested, *see Lauro,* 39 F.Supp.2d at 363 n. 8, the Fourth Amendment requires that it have been reasonable.[7] To that question we now turn.

2

█ Despite its adverse effects on Lauro's dignity and privacy, the perp walk might nevertheless have been reasonable under the Fourth Amendment, had it been sufficiently closely related to a legitimate governmental objective. *Cf. Graham,* 490 U.S. at 395; *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. In this respect, Charles argues that "the importance of the press in informing the general public about the administration of criminal justice has long been recognized by the Supreme Court," Appellant's Reply Br. at 12, and that this interest suffices to justify the perp walk before us.

The Supreme Court, however, in *Wilson* explicitly rejected an identical argument when it was proffered in support of the media ride-along in that case. The defendants had asserted three justifications for the presence of the media: (1) that officers should have discretion to decide when it would further the mission of law enforcement to allow media presence; (2) that accurate reporting on law enforcement activities was a significant interest; and (3) that the presence of media could deter law enforcement abuses. *See Wilson,* 526 U.S. at 612–13, 119 S.Ct. 1692. The Court found that none of these justifications was sufficient to overcome the Wilsons' Fourth Amendment rights, noting, "[w]ere such

---

7. In support of his contention that the Fourth Amendment is not implicated by the perp walk, Charles argues that the Supreme Court has held that physical characteristics of one's person are not a subject of Fourth Amendment protection. He relies primarily on *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), which held that compelled production of voice exemplars to a grand jury was not subject to a reasonableness requirement. *See id.* at 15, 93 S.Ct. 764. Charles's invocation of *Dionisio* is inapposite. The holding of *Dionisio* turned on the fact that, in being ordered to provide the grand jury with a voice exemplar, respondent was not asked to expose anything to the grand jury that he had not already exposed to the public at large. But Lauro was not merely commanded to exhibit his facial features to law enforcement officials—as would be required, for instance, in order for a mug shot to be taken. His complaint is not that his face has not remained "a mystery to the world," *id.* at 14, 93 S.Ct. 764, but rather that he was displayed to the world, against his will, in handcuffs, and in a posture connoting guilt.

generalized 'law enforcement objectives' themselves sufficient to trump the Fourth Amendment, the protections guaranteed by that Amendment's text would be significantly watered down." *Id.* at 612, 119 S.Ct. 1692. Moreover, with respect to the argument that the ride-along served to inform the public about the administration of law enforcement, the Court commented:

> There is certainly language in our opinions interpreting the First Amendment which points to the importance of "the press" in informing the general public about the administration of criminal justice.... But the Fourth Amendment also protects a very important right, and in the present case it is in terms of that right that the media ride-alongs must be judged....
>
> [T]he need for accurate reporting on police issues in general bears no direct relation to the constitutional justification for the police intrusion into a home in order to execute a felony arrest warrant.

*Id.* at 612–13, 119 S.Ct. 1692.

The same is true here. The interests of the press, and of the public who might want to view perp walks, are far from negligible. In this case, however, the press and the public were not viewing the actual event of Lauro being brought to the police station, but rather, were offered a staged recreation of that event. Even assuming that there is a legitimate state interest in accurate reporting of police activity, that interest is not well served by an inherently fictional dramatization of an event that transpired hours earlier. We conclude that, like the police actions in *Wilson* and *Ayeni*, the perp walk that occurred in the case before us not only intruded upon the privacy protected by the Fourth Amendment, but also lacked any legitimate law enforcement purpose, and hence was unreasonable.

In reaching this conclusion, we in no way question the reasonableness of Lauro's initial arrest. Thus, the search in *Ayeni* may well have been proper in itself, but was rendered unreasonable when, in undertaking it, the agents engaged in conduct whose only aim was to seize and broadcast images of the Ayenis and their home, thereby needlessly infringing their privacy. Similarly, in the case before us, the initial arrest was, we assume, perfectly lawful. But in staging the perp walk, Detective Charles engaged in conduct that was unrelated to the object of the arrest, that had no legitimate law enforcement justification, and that invaded Lauro's privacy to no purpose. By exacerbating Lauro's seizure in an unreasonable manner, Charles violated the Fourth Amendment. *See Graham,* 490 U.S. at 395, 109 S.Ct. 1865.

### C

It is important, however, to understand the limitations of our holding. First, we do not hold that all, or even most, perp walks are violations of the Fourth Amendment. Thus, we are not talking about cases in which there is a legitimate law enforcement justification for transporting a suspect. Accordingly, we do not address the case—seemingly much more common than the kind of staged perp walk that occurred here—where a suspect is photographed in the normal course of being moved from one place to another by the police. Nor do we reach the question of whether, in those circumstances, it would be proper for the police to notify the media ahead of time that a suspect is to be transported.

Second, we do not consider the issue of whether the videotaping of Lauro itself constituted a seizure of "intangibles," as the district court suggested. *See Lauro,* 39 F.Supp.2d at 363. Because we hold that the perp walk constituted an unreasonable exacerbation of the seizure that occurred when Lauro was arrested, there is no need for us to reach the question of whether the videotaping constituted a separate seizure.

Finally, it goes without saying that, because Fox 5 News was never a party to

this lawsuit, we are not intimating that it might be liable to Lauro for its participation in the perp walk. *Cf. id.* at 365 n. 11.

### III

■ Although Detective Charles's conduct in subjecting Lauro to the staged perp walk violated the Fourth Amendment, we hold that Charles is nevertheless entitled to qualified immunity.

■ Qualified immunity shields government officials from liability in their individual capacity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court has held that, to be thus established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted).

The district court found that Detective Charles was not entitled to qualified immunity. It reasoned:

Although there is no reported decision that expressly forbids the use of perp walks, the Second Circuit decision in *Ayeni* put all reasonable police officers on notice that making use of state resources and police force solely to aid the press in sensationalizing and humiliating a criminal suspect at the expense of the suspect's privacy rights, without any legitimate law enforcement interest, is constitutionally unacceptable. Although the search in *Ayeni* took place in a private home, the court notes the fact that images were taken of the Ayenis themselves. The *Ayeni* court's explicit recognition of the importance of being free from unjustifiably intrusive video and sound recordings, in addition to the long line of cases such as *Terry v. Ohio* that emphasize the important rights at stake when an officer manipulates and controls the body of a suspect, clearly established that the seizure of plaintiff by Det. Charles for the sole purpose of conducting a staged perp walk is unconstitutional.

*Lauro,* 39 F.Supp.2d at 368 (citations omitted).

In *Ayeni,* we held that the Secret Service agents were not protected by qualified immunity when they brought the TV camera crew along to record the search of the Ayenis' house. We stated that, although there was at the time no reported decision expressly forbidding such a practice, "[i]t has long been established that the objectives of the Fourth Amendment are to preserve the right of privacy to the maximum extent consistent with reasonable exercise of law enforcement duties and that, in the normal situations where warrants are required, law enforcement officers' invasion of the privacy of a home must be grounded on either the express terms of a warrant or the implied authority to take reasonable law enforcement actions related to the execution of the warrant." *Ayeni,* 35 F.3d at 686. Moreover, we concluded, the contours of the right at issue were sufficiently obvious so that a reasonable officer would have understood that the ride-along violated that right. *See id.*

In *Wilson,* however, although the Supreme Court confirmed *Ayeni*'s holding that bringing the media into a private home to film the execution of a warrant violated the Fourth Amendment, it found that the right was *not* sufficiently clearly established to warrant finding the individual officers liable in damages. The *Wilson* Court noted that "what 'clearly established' means in this context depends largely upon the level of generality at which the relevant legal rule is to be iden-

tified." *Wilson,* 526 U.S. at 614, 119 S.Ct. 1692 (quoting *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034) (internal quotation marks omitted). The Court stated:

> It could plausibly be asserted that any violation of the Fourth Amendment is "clearly established," since it is clearly established that the protections of the Fourth Amendment apply to the actions of police.... [However,] the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established. In this case, the appropriate question is the objective inquiry of whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law....

*Id.* at 615, 107 S.Ct. 3034 (citation omitted).

The Court then proceeded to answer the question it posed. "First," it said, "the constitutional question presented by this case is by no means open and shut.... Accurate media coverage of police activities serves an important public purpose, and it is not obvious from the general principles of the Fourth Amendment that the conduct of the officers in this case violated the Amendment." *Id.* at 615–16, 107 S.Ct. 3034. Second, the Court cited the absence of any decisions that were directly on point. Third, it pointed out that the officers had relied on a policy of the Marshal's Service that "explicitly contemplated that media who engaged in ridealongs might enter private homes," and that where the state of the law was undeveloped, it was not unreasonable for the officers to rely on a formal policy of their department. *Id.* at 617, 107 S.Ct. 3034. As a result, the Court concluded that it would not have been unreasonable for an officer to have believed, in 1992, that the ride-along was lawful. *See id.* at 617–18, 107 S.Ct. 3034.

In holding that the officers were entitled to qualified immunity, the *Wilson* Court implicitly found that *Ayeni* had defined the right at issue overly broadly. While the general principle of the Fourth Amendment—"to preserve the right of privacy to the maximum extent consistent with reasonable exercise of law enforcement duties," *Ayeni,* 35 F.3d at 686—is well-established, that principle in itself is not enough to warrant a finding that any particular violation of the principle should be clear to a reasonable police officer. As the *Wilson* Court said, were the general principle alone enough, "[i]t could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established.'" *Wilson,* 526 U.S. at 615, 119 S.Ct. 1692. And that result would be inconsistent with one of the policies behind the qualified immunity doctrine: to relieve individual officials of the burden of anticipating every new development in constitutional law.

The Supreme Court has made it clear, however, that government officials are not liable for constitutional violations only when "the very action in question has previously been held unlawful." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. Such a constricted view of the scope of official liability would deprive officers of the incentive to evaluate their actions carefully to determine if they are consistent with constitutional principles. Because law develops in large part through analogies, many decisions will apply general principles of constitutional law to facts that closely track, without being identical to, the facts of previous cases. And such holdings can often be easily predicted. If the unconstitutionality of an action is "apparent"—when compared to actions previously held to be unlawful—because the same right is set forth in an earlier case with the specificity required by *Wilson,* qualified immunity is not appropriate. *See id.*

There have been no reported decisions of which we are aware establishing the proposition that staged perp walks violate the Fourth Amendment. The appropriate inquiry is, therefore, how closely analogous the staged perp walk is to actions by the police that had been held unconstitutional

at the time Detective Charles acted. If the analogy is sufficiently close, he would not be entitled to qualified immunity.

The district court was correct to identify *Ayeni* as the case whose facts most closely approximate the perp walk.[8] As discussed above, the officers in *Ayeni*, by bringing a television crew along when executing a search warrant, engaged in conduct that was unreasonable because it invaded the Ayenis' privacy and because it had no legitimate law enforcement justification. Similarly, by forcing Lauro to walk outside the precinct house so that he could be filmed by a television crew, Detective Charles unreasonably exacerbated the seizure of Lauro in a way that served no law enforcement purpose.

There are, however, differences between *Ayeni* and this case that, we believe, render the likeness between the two less than obvious. Thus, the police action in *Ayeni* was a search, while in this case it was a seizure. More importantly, the search in *Ayeni* invaded a private home, an area that has traditionally been given the highest degree of protection by the Fourth Amendment, *see Ayeni*, 35 F.3d at 685, while the seizure in this case infringed Lauro's personal privacy in the course of detention by the police, a situation in which the privacy protections of the Fourth Amendment must often yield to law enforcement needs, *see Weber*, 804 F.2d at 800. For purposes of determining

whether the rule we announce today was clearly established by *Ayeni*, these are significant distinctions.[9] In light of *Wilson*'s admonition that the particular right must be defined with specificity, we are not prepared to say that a reasonable police officer should clearly have been able to discern that the search in *Ayeni* and the seizure in this case infringe what are merely different aspects of the same previously defined constitutional right.[10]

## IV

The same bedrock principles of the Fourth Amendment are offended by both the media ride-along and the staged perp walk. But we cannot say that a police officer should be held liable in damages for failing to reach that conclusion in 1995. Accordingly, we hold that, because the unconstitutionality of the staged perp walk was, until today, not clearly established, Detective Charles is entitled to qualified immunity for his participation in the perp walk.

\*     \*     \*

The order of the district court is REVERSED, and the case is REMANDED to that court for entry of judgment in favor of Detective Charles on the ground of qualified immunity.

8. The fact that *Wilson*, decided five years after *Ayeni*, reached an opposite conclusion as to whether qualified immunity was warranted in no way undercut *Ayeni*'s holding that the media ride-along violated the Fourth Amendment. *Ayeni* has, in our circuit, been clearly established law since 1994, and the perp walk in this case took place in September 1995. Accordingly, *Ayeni* must be our benchmark for determining whether the unconstitutionality of the staged perp walk was clearly established in 1995. (*Wilson*, of course, was not decided at the time of Lauro's perp walk, and thus cannot be the basis for a finding that the right at issue was clearly established at that time.)

9. This is not to say that there may not be cases where the analogy between an unrea-

sonable search and an unreasonable seizure is sufficiently close to be apparent in light of existing law, only that the case before us is not one of them.

10. The existence of qualified immunity is further supported by the fact that Charles was apparently following orders given by his superiors when he took Lauro on the perp walk. *See supra* note 4. *See Varrone v. Bilotti*, 123 F.3d 75, 81–82 (2d Cir.1997); *see also Bilida v. McCleod*, 211 F.3d 166, 174–75 (1st Cir. 2000) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists.").