Rocco **CALDAROLA** and James Santerello, Plaintiffs–Counter–Defendants,

Joseph **Freeman**, Plaintiff–Counter–Defendant–Appellant,

v.

The **COUNTY OF WESTCHESTER**, Andrew J. Spano, individually and in his capacity as County Executive of the County of Westchester and Rocco A. Pozzi, individually and in his capacity as Commissioner of the Westchester County Department of Correction, Defendants–Counter–Claimants–Appellees,

Westchester County Correction Officers Benevolent Association, Inc. and Joseph Maselli, Third–Party–Defendants.

Docket No. 01–7457.

United States Court of Appeals, Second Circuit.

Argued: Jan. 8, 2002.

Decided: Sept. 9, 2003.

Paula Johnson Kelly, Goodstein & West, New Rochelle, NY (Robert David Goodstein, on the brief), for Appellant.

Deborah A. Porder, County Attorney's Office (Charlene M. Indelicato, on brief), White Plains, NY, for Appellees.

Before: JACOBS, F.I. PARKER *, and SOTOMAYOR, Circuit Judges.

F.I. PARKER, Circuit Judge **.

Plaintiff-appellant Joseph Freeman ("Freeman") appeals from the judgment of ·the United States District Court for the Southern District of New York (Colleen McMahon, *Judge*) entered on March, 16, 2001, granting defendants-appellees' motion for summary judgment. Plaintiffs Freeman, Rocco Calderola, and James Santerello (collectively, the "plaintiffs"), former and current corrections officers for the Westchester County Department of Corrections ("DOC"), brought suit against defendants-appellees Westchester County (the "County") and against Westchester County Executive Andrew J. Spano ("Spano") and Westchester County Department of Corrections Commissioner Rocco A. Pozzi ("Pozzi"), each in his official capacity, under 42 U.S.C. § 1983 ("section 1983") for alleged violations of their Fourth Amendment rights stemming from their July 12, 1999 arrests on charges of grand larceny. The district court held that the plaintiffs' constitutional rights were not violated by the County's various actions, including videotaping them post-arrest, choreographing their arrests to facilitate videotaping, distributing the videotape to the media, and advising the media of their impending "perp walks" to the courthouse for arraignment. Freeman appealed.

* The Honorable Fred I. Parker, who was a member of the panel, died on August 12, 2003. Prior to his death, Judge Parker participated in the consideration and decision of this case.

** Judge Parker is the author of the opinion of the Court, which was in substantially final form at the time of his death.

For the reasons set forth herein, we conclude that the legitimate government purposes served by the County's actions outweigh Freeman's privacy interests, and Freeman therefore did not suffer any violation of his Fourth Amendment rights. Accordingly, we affirm the judgment of the district court.

## I. Background

We briefly recite the basic facts relevant to the disposition of this case.[1] Freeman and several fellow corrections officers were arrested as a result of a County investigation of corrections officers suspected of receiving disability benefits on the basis of fraudulent job injury claims. DOC surveillance efforts yielded incriminating evidence regarding certain corrections officers, all of whom were on paid disability leave. An employee from DOC's Special Investigations Unit telephoned those corrections officers and directed them to report to DOC headquarters on Monday, July 12, 1999.

Upon arrival, each summoned corrections officer was placed in a separate room. Sometime thereafter, each was placed under arrest by officers from the Department of Public Safety ("DPS"), handcuffed, and then transported to the police station. A County employee videotaped Freeman and the other arrestees walking through the DOC parking lot as they were escorted from the DOC building, where they were arrested, to the cars in which they were transported to the police station for booking.

On the same day, the County held a press conference to publicize its investigation of and crackdown on fraudulent job injury claims by corrections officers. County Executive Spano announced the

arrests and played the videotape made by the County employee of the arrested corrections officers as they were escorted from the DOC building to waiting cars. Copies of the videotape were distributed to the media.

In addition, the Commissioner of Public Safety informed those present that "after the arrests these people were transported to the Westchester County police headquarters, processed, and they're pending arraignment right now in the Town of Mt. Pleasant Court." *Caldarola,* 142 F.Supp.2d at 435. Upon his arrival at the courthouse for arraignment, Freeman was left to wait in the car in which he was transported for ten to fifteen minutes until the car carrying two other arrestees arrived. During this time, Freeman was filmed by the media. The media also filmed the arrestees as they ascended the steps of the courthouse.

## II. Discussion

The "perp walk," that is, when an accused wrongdoer is led away in handcuffs by the police to the courthouse, police station, or jail, has been featured in newspapers and newscasts for decades. The normally camera-shy arrestees often pull coats over their heads, place their hands in front of their faces, or otherwise attempt to obscure their identities. A recent surge in "executive perp walks" has featured accused white collar criminals in designer suits and handcuffs. Whether the accused wrongdoer is wearing a sweatshirt over his head or an Armani suit on his back, we suspect that perp walks are broadcast by networks and reprinted in newspapers at least in part for their entertainment value. Yet, perp walks also serve the more serious purpose of educating the public about law enforcement efforts. The image of the accused being led away to contend with

---

1. A more detailed factual statement is set forth in the district court opinion, *Caldarola v.* *County of Westchester,* 142 F.Supp.2d 431 (S.D.N.Y.2001).

the justice system powerfully communicates government efforts to thwart the criminal element, and it may deter others from attempting similar crimes.

At the same time, we are cognizant that the characteristics of the perp walk that serve legitimate government purposes also implicate the accused's privacy interests. Ruling on Freeman's section 1983 claims requires us to carefully balance the accused's privacy interests against the government purposes underlying the perp walk.

An earlier opinion, *Lauro v. Charles*, marked this Court's first foray into the constitutional implications of the perp walk. 219 F.3d 202 (2d Cir.2000). In *Lauro*, the plaintiff brought a section 1983 suit against the New York City Police Department for violating his Fourth Amendment rights by subjecting him to a staged perp walk. Approximately two hours after Lauro was arrested and brought to the police station, a police detective staged a perp walk in response to media interest in the arrest. A detective handcuffed Lauro, escorted him outside of the police station, drove him around the block in a police car, and then escorted him from the car back into the station. A television crew filmed the staged walk from the car back into the station.

This Court found that Lauro was seized within the meaning of the Fourth Amendment, "[r]egardless of whether the seizure is viewed as (1) a separate seizure that occurred when Lauro was forcibly removed from the station and brought back in, or (2) a continuation and aggravation of the seizure that occurred when he was arrested ...." *Id.* at 212. The staged perp walk implicated Lauro's protected privacy interest in not being "displayed to the world, against his will, in handcuffs, and in a posture connoting guilt." *Id.* at

212, n. 7. No government purpose was served by the staged perp walk. *Id.* at 213. This Court noted that any "legitimate state interest in accurate reporting of police activity ... is not well served by an inherently fictional dramatization of an event that transpired hours earlier." *Id.* This Court therefore concluded that the staged perp walk violated Lauro's constitutional right to be free from unreasonable seizures. Although *Lauro* expressly did not reach the constitutionality of an actual, unstaged perp walk, *Lauro* substantially informs our analysis.

### A. District Court Proceeding

Freeman premised his section 1983 claim on the Fourth Amendment right to be free from unreasonable searches and seizures. The district court rejected his claim, holding that the County had not engaged in any behavior constituting an unreasonable seizure. *Caldarola*, 142 F.Supp.2d at 436–44. In particular, the district court held that: (1) the act of videotaping the arrestees was not a seizure of intangibles and did not interfere with any possessory interests of Freeman or the other arrestees, *id.* at 439, (2) the choreography of the arrests did not result in the unreasonable exacerbation of the arrests, *id.* at 440, (3) the public dissemination of the County-made videotape did not implicate any protected privacy interests, *id.* at 440–42, and (4) advising the media of the arrestees' impending arraignment did not implicate any constitutional rights, *id.* at 443.

On appeal, Freeman asserts that the district court erred with regard to all of its legal conclusions underlying the grant of summary judgment in favor of defendants-appellees. We review de novo the district court's decision to grant summary judgment in favor of the defendants-appellees.[2]

**2.** Freeman also challenges the district court's     grant of summary judgment on the ground

*See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir.1998).

   B.  The County's Acts of Coordinating the Arrests, Videotaping the Walk, and Disseminating the Videotape

Freeman argues that the County's acts of coordinating the arrests, videotaping the post-arrest walk in the DOC parking lot, and disseminating the videotape each violated his Fourth Amendment rights. Because Freeman's privacy interests are the same in each incident, and because the County's purposes are the same with regard to each act, we analyze jointly the constitutionality of these acts.

1.  Fourth Amendment Seizure Occurred

The Fourth Amendment to the Constitution of the United States provides in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ....

U.S. Const. Amend. IV. If the Fourth Amendment is implicated by defendants' actions in this case, then the issue becomes whether the defendants' actions in connection with any seizures which occurred were unreasonable under the circumstances. At the outset, we disagree with the district court's conclusion that the videotaping did not implicate the Fourth Amendment because there was no "physical intrusion that interfered with any possessory interest [Freeman] possessed," and it did not result in a seizure within the meaning of the Fourth Amendment. *Caldarola*, 142 F.Supp.2d at 439. Two types of Fourth Amendment seizures actually occurred here. First, Freeman was undeniably seized as a result of his lawful arrest. The manner and scope of his arrest—including

the conduct of which he complains—must be reasonable. "[T]he Fourth Amendment's proscription of unreasonable searches and seizures 'not only ... prevent[s] searches and seizures that would be unreasonable if conducted at all, but also ... ensure[s] reasonableness in the manner and scope of searches and seizures that are carried out.'" *Lauro*, 219 F.3d at 209 (quoting *Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir.1994)).

  ■■  Second, the making of the videotape resulted in the seizure of Freeman's image. The Fourth Amendment seizure has long encompassed the seizure of intangibles as well as tangibles. Although "[i]t is true that ... at one time ... th[e] [Fourth] Amendment was thought to limit only searches and seizures of tangible property .... '[t]he premise that property interests control the right of the Government to search and seize has been discredited.'" *Katz v. United States*, 389 U.S. 347, 352–53, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967) (citation and footnote omitted). The Supreme Court has "expressly held that the Fourth Amendment governs not only the seizure of tangible items," but also extends to the seizure of intangibles. *Id.* at 353, 88 S.Ct. 507, (holding that recording of oral statements resulted in Fourth Amendment seizure); *see also United States v. Villegas*, 899 F.2d 1324, 1334–35 (2d Cir.1990) (Fourth Amendment extends to seizures of photographs and other intangibles).

In *Ayeni*, this Court determined that a television crew's "video and sound recordings [of the execution of a search warrant] were 'seizures' under the Fourth Amendment." *Ayeni*, 35 F.3d at 688–89 (abrogated on other grounds by *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143

---

that there were unresolved issues of material fact. We agree with the district court that there were no disputed issues of material fact.

Summary judgment was therefore appropriate.

L.Ed.2d 818 (1999)). Just as "the purpose of the TV crew's intrusion into the Ayeni home was to seize images and sounds of the Ayeni home, and of the Ayenis themselves, that were intended for public viewing by television audiences," *id.* at 688, the purpose of the County employee's presence on DOC grounds was to seize images of Freeman intended for public viewing by television audiences. Thus, whether conceptualized as a seizure of Freeman's image or an exacerbation of his arrest, the County's act of videotaping Freeman constituted a seizure under the Fourth Amendment.

#### 2. Freeman's Reasonable Expectation of Privacy

The reasonableness of an individual's expectation of privacy will vary in accordance with the circumstances of a given seizure. There is, for example, a very high degree of privacy protection when an individual is in his or her home. *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). One's privacy interests receive much less protection in public places. However, a private space (such as a desk) within an otherwise public space (such as a government building) will justify an expectation of privacy. *See, e.g., O'Connor v. Ortega*, 480 U.S. 709, 718, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987) (recognizing public employee's reasonable expectation of privacy in desk and file cabinets at work).

In this set of circumstances, the County's creation and dissemination of the videotape implicate privacy interests that are protected by the Fourth Amendment. *Lauro* instructs that an accused possesses a privacy interest in not being "displayed to the world, against his will, in handcuffs, and in a posture connoting guilt." *Lauro,* 219 F.3d at 211, 212, n. 7. Freeman's reasonable expectation of privacy on DOC grounds, however, was minimal. Although "the Fourth Amendment protects people, not places," *Katz,* 389 U.S. 347 at 351, 88 S.Ct. at 511, 19 L.Ed.2d 576, "[e]xpectations of privacy can vary, depending on circumstances and location," *United States v. Thomas,* 729 F.2d 120 (2d Cir.1984) ("parolee's diminished expectation of privacy [for his clothing and person] would necessarily be further diminished while he is in his parole officer's office").

Freeman argues that his expectation of privacy while on DOC grounds is significant because public access to DOC grounds is generally limited. However, when the videotape was made, Freeman was outdoors in a place over which he exerted no dominion. Further, DOC employees such as Freeman are generally aware that it is their employer's prerogative, not their own, to decide who may have access to DOC grounds. It should not surprise Freeman that the County granted DOC access to the County employee who made the videotape in question. Or, put another way, Freeman could have no reasonable expectation that other County employees would be excluded from access to DOC property merely because he had been arrested.

This is not to say that Freeman's reasonable expectation of privacy while on DOC grounds was any less than that of Lauro while on a public street. Freeman's reasonable expectation of privacy was at least equal to that of Lauro, who was also outdoors in a place over which he exerted no dominion. A careful reading of *Lauro,* however, reveals that it was not the magnitude of Lauro's privacy interest that enabled him to prevail on his claim, but instead the lack of any legitimate purpose served by "an inherently fictional dramati-

zation of an event that transpired hours earlier." *Lauro,* 219 F.3d at 213.

### 3. Legitimate Government Purpose

■ Our inquiry does not end with the determination that Freeman's privacy interests (although minimal) were implicated by the County's actions. "[A] Fourth Amendment examination of a search or seizure ... requires a contextualized reasonableness analysis that seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the state." *Lauro,* 219 F.3d at 209. We therefore examine the government purposes underlying the making and release of the videotape.

■ The County's purposes in making the videotape were the same as its purposes in distributing the videotape to the media: the County created and distributed the videotape to inform the public about its efforts to stop the abuse of disability benefits by its employees.[3] The fact that corrections officers—public employees—were arrested on suspicion of grand larceny is highly newsworthy and of great interest to the public at large. Divulging the arrests also enhances the transparency of the criminal justice system, and it may deter others from attempting similar crimes. Furthermore, allowing the public to view images of an arrestee informs and enables members of the public who may come forward with additional information relevant to the law enforcement investigation. *C.f. Detroit Free Press, Inc.,* 73 F.3d at 98 ("[R]elease of a photograph of a defendant can more clearly reveal the government's

glaring error in detaining the wrong person for an offense than can any reprint of only the name of an arrestee.").

Freeman attempts to discredit these legitimate government purposes on the ground that they were insufficient to overcome the privacy interests at issue in two other Fourth Amendment cases. Both cases cited by Freeman are easily distinguished from the instant case. In *Lauro,* this Court found that there was no legitimate government purpose behind the staged perp walk precisely because of the staged nature of the walk. *Lauro,* 219 F.3d at 213. *Lauro* expressly did not reach "cases in which there is a legitimate law enforcement justification for transporting a suspect." *Id.* (noting that "[t]he interests of the press, and of the public who might want to view [actual, unstaged] perp walks, are far from negligible"). Although the County arrested Freeman and the other corrections officers after requiring them to show up at the same designated place and time, the coordinated nature of the arrests does not alter the fact that the County possessed a "legitimate law enforcement justification for transporting" Freeman from DOC grounds to the police station. *Id.* The government purposes that were rejected in *Lauro* are valid in this situation because the County videotaped Freeman as he was being legitimately transported pursuant to a lawful arrest.

The other case Freeman relies upon, *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), can also be easily distinguished from the case before

---

**3.** We note that videotape can also be used to serve the legitimate government purpose of protecting individuals from police abuse and protecting police from false accusations of abuse, such as installing video equipment on police cruisers to record interactions between police officers and individuals pulled over in traffic stops. *See Ohio v. Robinette,* 519 U.S. 33, 35, 117 S.Ct. 417, 419, 136 L.Ed.2d 347

(1996) (noting the use of mounted video camera to record routine traffic stops); *see also Detroit Free Press, Inc. v. Department of Justice,* 73 F.3d 93, 98 (6th Cir.1996) (releasing images of the accused to the public "can startlingly reveal the circumstances surrounding an arrest and initial incarceration of an individual in a way that written information cannot").

us. In *Wilson,* the Supreme Court held that homeowners' Fourth Amendment rights were violated when police brought media representatives into a private residence to observe and record the attempted execution of an arrest warrant. The Supreme Court determined that the substantial privacy interests of a person in his or her home outweighed the proffered government purposes behind the media ride along. According to the Supreme Court, the government's claim that the ride along "would 'further their law enforcement mission'" ignored "the importance of the right of *residential privacy* at the core of the Fourth Amendment." *Id.* at 612, 119 S.Ct. 1692 (emphasis added). Similarly, "publicizing the government's efforts to combat crime [ ] and facilitat[ing] accurate reporting on law enforcement activities" was "simply not enough, standing alone, to justify the ride-along intrusion into a *private home.*" *Id.* at 612–13, 119 S.Ct. 1692 (emphasis added). Thus, concluded the *Wilson* court, these government purposes "fall short of justifying the presence of media *inside a home.*" *Id.* at 614, 119 S.Ct. 1692 (emphasis added). The Court therefore held "that it is a violation of the Fourth Amendment for the police to bring members of the media or other third parties *into a home* during the execution of a warrant when the presence of the third parties in the home was not in aid of execution of the warrant." *Id.* (emphasis added). By comparison, Freeman's reasonable expectation of privacy in the DOC parking lot is minimal and not comparable to that of an individual in his home, which "is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose." *Id.* at 609, 119 S.Ct. 1692 (quoting *Semayne's Case,* 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B.)).

Whether the government purposes served by creating and distributing the videotape would have alternatively been served or served as well by a press conference without the controversial videotape are questions we need not answer. It is unnecessary for us to inquire into the alternative means by which the police could achieve the same goals, so long as the method used is constitutional, as it is here. We do not suggest that government actors have free reign to use videotape or other potentially overly intrusive means to achieve the government purposes enumerated above. As we have previously held, it is possible for government actors to overstep the bounds of reasonableness in the course of a search or seizure, even when serving important government interests. Because there was a minimal expectation of privacy in the parking lot, and the conduct of the arresting officers did not unreasonably exceed the scope of what was necessary to effectuate the arrest and to otherwise serve legitimate government purposes, this is not such a case.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the defendants-appellees. Although Freeman possessed a privacy interest in not having his "perp walk" broadcast to the public, that privacy interest was outweighed by the County's legitimate government purposes. Therefore, Freeman sustained no actionable Fourth Amendment injury.