Donna POLK, and Christopher J. Bell, Plaintiffs,

v.

DISTRICT OF COLUMBIA, Detective Nelson Valdes, and Luis Aponte, Defendants.

No. CIV.A. 99–3088(RMU).

United States District Court, District of Columbia.

Oct. 26, 2000.

Stephen E. Whitted, Bethesda, MD, for plaintiffs.

Ted Justice Williams, Washington, DC, for Nelson Valdes, defendant.

Jonathan E. Halperin, Regan, Halperin & Long, P.L.L.C., Washington, DC, for Luis Aponte, defendant.

Eugene A. Adams, III, Kimberly Cheronn Matthews, Allison H. Alvarado, Office of Corp. Counsel, DC, Washington, DC, for District of Columbia, defendant.

## MEMORANDUM OPINION

URBINA, District Judge.

### Denying in Part Defendant Nelson Valdes's Motion to Dismiss

## I. INTRODUCTION

This matter comes before the court upon defendant Nelson Valdes's motion to dismiss or, in the alternative, for summary judgment. The plaintiffs, Donna Polk and Christopher Bell, allege that Detective Valdes, individually and in his official capacity as an officer of the Metropolitan Police Department of the District of Columbia ("MPD"), deprived them of their constitutional rights in violation of 42 U.S.C. §§ 1981, 1983, and 1988, and the First, Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution. In addition to Det. Valdes, the plaintiffs name the District of Columbia, a municipal corporation, and Luis Aponte, in his individual capacity and as an alleged agent of the MPD.

Det. Valdes asks the court to dismiss the plaintiffs' claims on the grounds that he enjoys qualified immunity from suit, that the applicable District of Columbia statute of limitations bars the plaintiffs' common-law claims, and that the allegations of false arrest and false imprisonment fail to state a claim upon which relief can be granted. For the reasons that follow, the court holds that the use of an unauthorized civilian to effectuate a stop violates clearly established law, and that it was not objectively reasonable for Det. Valdes to believe he was respecting the plaintiffs' constitutional rights. The court also rules that because the facts concerning the availability of the immunity defense are in dispute as to Det. Valdes's reasonable suspicion for the stop, and because a reasonable trier of fact could find that the Det. Valdes's actions were objectively unreasonable, the court cannot grant the defendant qualified immunity at this time. Finally, the court does not rule on Det. Valdes's motion to dismiss the plaintiffs' common law claims, but instead will allow the plaintiffs additional time to oppose Det. Valdes's motion.

## II. BACKGROUND

On November 21, 1997, at approximately 1:30 a.m., Donna Polk and Christopher Bell returned to the Washington Plaza Hotel after a late dinner with friends. *See* Am. Compl. ¶ 13; Plaintiffs' Opposition to Defendant Nelson Valdes [sic] Motion to Dismiss Plaintiffs' Complaint or in the Alternative for Summary Judgment ("Opp'n") at 8. Polk, an African–American woman, is the Executive Director of the Nebraska Urban Indian Health Coalition in Lincoln, Nebraska. Bell, who is Native American, is a law-school graduate and, at

the time these claims arose, was a member of the Board of Directors of the American Indian Health and Family Services of Southeastern Michigan, Inc. The plaintiffs were staying at the Washington Plaza Hotel while attending the Indian Health Service Round Table Symposium in Washington, D.C. *See* Am. Compl. ¶¶ 4, 5; Def. Det. Valdes's Motion to Dismiss Plaintiffs' Complaint, or in the Alternative, for Summary Judgment ("Mot. to Dis."), Ex. 2, Investigation Report and Recommendation Concerning Reported Misconduct of Third District Det. Nelson Valdes ("Inves.Rep.") at 1.

As the plaintiffs walked through the hotel lobby, Det. Valdes and Aponte intercepted them. *See* Am. Compl. ¶ 11. According to the plaintiffs, Det. Valdes and Aponte, who were both dressed in plain-clothes, identified themselves as MPD officers.[1] *See id.*; Opp'n at 9. The plaintiffs also claim that when Det. Valdes flashed a badge to identify himself, Aponte made a similar gesture with an official emblem, which the plaintiffs assumed was a police badge. *See* Am. Compl. ¶ 12; Inves. Rep. at 1. Det. Valdes did nothing to dissuade Aponte's conduct, although it occurred in his presence. *See* Opp'n at 9. To the contrary, the plaintiffs allege that when Det. Valdes later took Polk out of the hotel, he encouraged Aponte to keep Bell behind an imaginary line in the hotel, which Aponte so did. *See id.*

In fact, Aponte was neither an MPD officer nor employee, but rather had accompanied Det. Valdes that evening as a "civilian ride-a-long." *See* Opp'n at 8; Inves. Rep. at 3. During the MPD's internal investigation of the incident (prompted by a complaint filed by Bell with the MPD), Aponte admitted that in the past he had accompanied Det. Valdes on several tours of duty, though he had never completed the proper ride-a-long authorization forms. *See* Inves. Rep. at 3. The evening in question was no exception. Indeed, the

---

1. In his motion to dismiss, Det. Valdes makes no mention of whether Aponte also identified himself as an MPD officer. *See* Mot. to Dis. at 4.

MPD's investigation revealed both that Aponte had failed to complete the requisite paperwork, and that Det. Valdes had not attempted to verify whether Aponte was authorized to participate in the ride-a-long program—an MPD requirement.[2] *See id.* at 6–7.

Unaware that Aponte was not a police officer, Bell inquired several times as to why the officers had stopped him and Polk in the lobby of the hotel. *See* Am. Compl. ¶ 13. Aponte did not reply, but instead repeated his requests for Bell's identification. *See id.*; Mot. to Dis. at 4. Aponte then ordered Bell to remain behind an imaginary line inside the hotel. After five minutes, when Bell began to move, Aponte ordered him to "stay behind the line," *see* Am. Compl. ¶ 14, and held up his hands in a gesture to prevent Bell's free movement. *See* Opp'n at 9. At the same time, Det.

Valdes "grabbed" Polk's arm and escorted her outside the hotel where he kept her "against her will," even while she insisted that she was a guest at the hotel. *See* Am. Compl. ¶¶ 17–18; Polk Aff. ¶ 9.

Det. Valdes explains that he noticed Polk entering the hotel because she fit the description of a prostitute whom the MPD suspected of robbery.[3] *See* Mot. to Dis. at 3. According to Det. Valdes, Polk matched the description of the prostitute in both her physical build and her attire ("a red sweater, a short skirt, high boots and black stockings").[4] *See id.* at 4. Contrary to Polk's assertion that he "physically" took her outside the hotel, *see* Am. Compl. ¶ 16, Det. Valdes states that he merely asked Polk to step outside, she complied, and after a brief interview, he became satisfied that she was not the suspect he was seeking.[5] *See* Mot. to Dis. at 4. Polk recalls

2. In an undated memorandum, the MPD sustained Bell's complaint against Det. Valdes. The MPD also recommended that Det. Valdes be cited for adverse action by the Human Resources Officer on the following charges and specifications:

Charge No. 1 Violation of General Order 1202.1, Part 1, (B)(16), which states: "Failure to obey orders or directives issued by Chief of Police."
Specification No. 1 ... on or about, Thursday, November 20, 1997 ... Det. Nelson Valdes allowed Mr. Luis Aponte to ride with him in a Department vehicle as a civilian Ride–a–Long, without authorization. Aponte admitted to riding with Detective Valdes on prior occasions without completing the Ride–a–Long forms. On this evening, he also failed to complete the forms as required by General Order. Detective Valdes failed to ensure that Aponte had received permission to participate in the program.
Charge No. 2 Violation of general Order 1202.1, Part 1, (B)(12), which states in part: "conduct unbecoming an officer, including acts detrimental to good discipline, conduct that would affect adversely the employee's or the agency's ability to perform effectively ..."
Specification No. 1 ... Detective Nelson Valdes stopped Ms. Donna Polk ... without justification, and told her that she "appeared to be a prostitute," as she and a male co-worker were entering a city hotel. Detective Valdes's comment was made in

the presence of Mr. Luis Aponte, and hotel employees.
Invest. Report. at 6–7.

3. Det. Valdes does not explain in his motion to dismiss whether he entered the hotel looking for the robbery suspect. The plaintiffs point out that "[n]o one associated with the hotel had summoned Det. Valdes to the hotel for any police-related reason." Opp'n at 8 (citing Affidavit of Donald Barbour, ("Barbour Aff.") Dated Aug. 28, 2000, at ¶ 8).

4. Polk also offers her own description of her attire that evening: "I wore a knee-length skirt, boots, stockings [sic] sweater and a Stanley Blacker, double-breasted jacket to go to dinner. These were the same professional clothes I had worn to the business sessions of the conference I attended earlier that day. My clothing was not provocative or suggestive in any sense." Affidavit of Donna Polk, ("Polk Aff."), Dated Aug. 28, 2000, Opp'n.

5. The parties dispute the duration of the encounter. According to the plaintiffs, "Detective Valdes and Luis Aponte detained the Plaintiffs against their will for some fifteen to twenty-five minutes." Opp'n at 9 (citing Affidavit of Christopher Bell, ("Bell Aff."), Dated Aug. 25, 2000, ¶ 19). By contrast, Det. Valdes states that in the course of an internal investigation into the incident, the MPD obtained a surveillance tape from the hotel that shows that the incident lasted six minutes. *See* Mot. to Dis. at 5 (citing Inves. Rep. at 4–5).

that Det. Valdes never informed her that he was investigating a robbery, or that she fit the description of a robbery suspect. *See* Polk Aff. ¶ 14. He did, however, accuse her of being a prostitute, an accusation which Polk claims he made solely because of her race. *See id.* ¶ 16.

The plaintiffs allege that the defendant's actions—effectuated with the assistance of a civilian but without probable cause, reasonable suspicion, or a warrant—constituted an unlawful stop and seizure in violation of their constitutional rights. *See* Opp'n at 11–16. Defendant Valdes responds that he had a reasonable, good-faith basis on which to conduct an investigatory stop and thus enjoys qualified immunity for his actions. *See* Mot. to Dis. at 7–12. He further asserts that the court must dismiss the plaintiff's common-law claims of battery, false arrest, and false imprisonment as untimely and for failure to state a claim. *See id.* at 12–14.

## III. LEGAL STANDARD

The defendant asks the court to dismiss the plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6), or in the alternative, to grant him summary judgment pursuant to Rule 56. *See* Mot. to Dis.; FED.R.CIV.P. 12(b)(6) and FED. R.CIV.P. 56. The Federal Rules of Civil Procedure provide that on a motion to dismiss for failure to state a claim, when either or both parties present matters out-

side the pleadings, the court shall treat the motion as one for summary judgment. *See* FED. R. CIV. P. 12(b); Charles A. Wright & Arthur R. Miller, 5A FED. PRAC. & PROC.2d § 1366. In this case, both parties have submitted materials outside the pleadings. Accordingly, the court will treat the present motion as one for summary judgment pursuant to Rule 56.[6]

A court may grant summary judgment only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The court must consider all evidence and the inferences drawn from it in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant bears the burden of demonstrating the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A material fact is one whose resolution would "affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Borgo v. Goldin*, 204 F.3d 251, 254 (D.C.Cir.2000).

---

**6.** Det. Valdes raises two affirmative defenses—qualified immunity and statute of limitations—in his motion to dismiss. Because the facts necessary to establish an affirmative defense generally must be shown by matter outside the complaint, numerous courts have held that affirmative defenses cannot be the basis for a motion to dismiss; rather, such defenses must be raised in the answer. *See, e.g., Mustfov v. Rice*, 663 F.Supp. 1255, 1260 (N.D.Ill.1987); *Drummond v. Spero*, 350 F.Supp. 844 (D.Vt.1972); *Eberle v. Sinclair Prairie Oil Co.*, 35 F.Supp. 296 (E.D.Okla. 1940), *aff'd*, 120 F.2d 746; *see also* Charles A. Wright & Arthur R. Miller, 5 FED. PRAC. & PROC. CIV.2d § 1277.

Moreover, even when an affirmative defense such as statute of limitations is apparent from

the face of the complaint, there may be facts tolling the running of the statute that do not appear in the complaint. In practice, courts that allow the adjudication of affirmative defenses on a motion to dismiss will convert the motion into one for summary judgment and will consider all pertinent evidentiary material. Such concerns are relevant here, where the defendant raises both statute-of-limitations and qualified-immunity defenses. For these reasons, as well as the reasons stated above, the court will allow the defendant to raise his affirmative defenses in a motion rather than in an answer; however, the court will treat the defendant's motion as one for summary judgment.

Mere allegations in the pleadings do not suffice to defeat a summary judgment motion. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. If the moving party shows that there is an absence of evidence to support the non-moving party's case, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

### A. Section 1983

The plaintiffs bring this action pursuant to 42 U.S.C. § 1983 ("Section 1983"). Section 1983 creates a cause of action against any person who, acting under the color of state law, abridges rights guaranteed by the Constitution or the laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled o.g., Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). This section does not create any new substantive rights but instead provides a remedy for the violation of federal constitutional or statutory rights.[7] *See Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Although Section 1983 speaks of liability in absolute terms—that is, it carves out no exceptions on its face—the Supreme Court has held that all officers possess some degree of immunity from liability. *See, e.g., Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Accordingly, the court turns to a discussion of the quali-

fied immunity doctrine and Det. Valdes's assertion of a qualified immunity defense.

### B. The Qualified Immunity Doctrine

Qualified immunity is one of the most significant and problematic defenses to Section 1983 actions. As one commentator has noted, the development of the qualified immunity doctrine "has been marked by *ad hoc* decisionmaking, conflicting rationales, and a high degree of doctrinal manipulation." *See* David Rudovsky, *The Qualified Immunity Doctrine in the Supreme Court: Judicial Activism and the Restriction of Constitutional Rights*, 138 U. Pa. L.Rev. 23, 35 (1989). Indeed, the doctrine itself finds no support in the Constitution or the common law; and on its face, the language of Section 1983 "admits of no immunities." *See Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *see also* Erwin Chemerinsky, *Federal Jurisdiction* 3d. ed. 514 (1999) ("Chemerinsky").

In fact, it was not until 1967 that the Supreme Court raised qualified immunity as a shield to Section 1983 actions. In *Pierson v. Ray,* Chief Justice Earl Warren, writing for the majority, concluded that a Mississippi policeman would be immune from Section 1983 liability if he arrested civil rights workers under a state law later found to be unconstitutional but which was valid at the time of his actions.[8] *See* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. The Court reasoned that Section 1983 should be read as incorporating the common-law immunities that were in place in 1871, the year of its passage. *See id.* at 554–55, 87 S.Ct. 1213. In addition to the

---

**7.** The plain language of Section 1983 appears to contemplate a broad remedy, providing that:
> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...
42 U.S.C. § 1983.

**8.** The defendant arrested the plaintiffs pursuant to a state statute later ruled unconstitutional because it was used to enforce segregation of interstate transportation facilities. *See Pierson*, 386 U.S. at 549, 557, 87 S.Ct. 1213.

background of 1871 common law, however, the Court based its reasoning on a policy assessment that it would be unfair to hold individual government officials liable when they acted in good faith but were later determined to have violated constitutional rights. "A policeman's lot is not so unhappy," the Chief Justice stated, "that he must choose between being charged with dereliction of duty if he does not arrest when he had probable cause, and being mulcted in damages if he does." *Id.* at 555, 87 S.Ct. 1213.

The Supreme Court's early formulation of the qualified immunity defense incorporated both objective and subjective components. If the government official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate ... constitutional rights" or if the official "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury," the official would face the possibility of liability for his actions. *See O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

Over time, however, the Court found that this second, subjective prong of the test often precluded summary judgment because it raised factual issues regarding the officer's subjective beliefs or intent. In the seminal qualified immunity case, *Harlow v. Fitzgerald,* the Court discarded the subjective inquiry, and articulated a wholly objective qualified immunity defense, reasoning that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." [9] *See* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396. Under this standard, an official would be immune from suit if the operative legal principle underlying the claim was not clearly established at the time of the alleged wrongdoing, or even if the legal standard was clearly established, if a reasonable police officer would have believed the conduct to be legal.[10] *See id.* at 818, 102 S.Ct. 2727.

█ In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court clarified the *Harlow* standard in two ways that bear on the analysis of Det.

9. The Fifth Circuit has characterized *Harlow* as sparking a "quiet revolution" in the law of qualified immunity. *See Saldana v. Garza,* 684 F.2d 1159, 1163 n. 15 (5th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983). Indeed, the Supreme Court itself has admitted that the qualified immunity defense is quite distinct from the original "good faith and probable cause" defense first articulated in *Pierson v. Ray. See Wyatt v. Cole,* 504 U.S. 158, 165, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). The defense in its current form is based "on principles not at all embodied in the common law." *See Anderson v. Creighton,* 483 U.S. at 645, 107 S.Ct. 3034. Rather, it is meant to "[strike] a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt,* 504 U.S. at 167, 112 S.Ct. 1827.

10. On a motion for summary judgment, *Harlow's* interpretation of the qualified immunity issue does not "alter the burden that Rule 59(c) of the Federal Rules of Civil Procedure places on the movant to demonstrate, as a condition of summary judgment, that the ob-

jective inquiry raises 'no genuine issue as to any material fact....' " *See Martin v. Malhoyt,* 830 F.2d 237, 256 (D.C.Cir.), *reh. denied,* 833 F.2d 1049 (D.C.Cir.1987) (quoting *Halperin v. Kissinger,* 807 F.2d 180, 188–89 (D.C.Cir. 1986) (Scalia, J., sitting by designation)); *see also Briggs v. Goodwin,* 698 F.2d 486, 489 n. 2 (D.C.Cir.) (the "rules governing summary judgment in cases involving officials claiming a qualified immunity do not differ from those applicable in other contexts"), *vacated o.g.,* 712 F.2d 1444 (D.C.Cir.1983).

Thus, summary judgment on the basis of a claim of qualified immunity is appropriate only

if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.

*In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir.1996); *see also Halperin v. Kissinger,* 807 F.2d at 189.

Valdes's claim for qualified immunity. First, the Court held that whether a government official asserting qualified immunity could be held personally liable for conduct that violated a constitutional or statutory right depended on the "objective legal reasonableness" of his action. *See id.* at 639, 107 S.Ct. 3034. In other words, the "touchstone" of the analysis was whether the defendant had acted in an objectively reasonable manner as measured by clearly established law. Second, the Court elaborated on the meaning of a "clearly established right":

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* (citation omitted); *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). Professor Rudovsky writes that in the lower courts, the application of the "clearly established law" standard has "proved to be anything but routine, and a welter of confusing and conflicting opinions has emerged over the proper definition of 'clearly established.'" *See* Rudovsky, 138 U. PA. L. REV. at 45. As a consequence, the law remains unsettled on the issue of what constitutes clearly established constitutional or statutory rights. *See* Chemerinsky at 520. For example, how close must the "factual correspondence be between the actions under consideration and the decisions that establish constitutional law?" *See id.* How is it decided what a reasonable officer should know? *See id.*; *see also People of Three Mile Island v. N.R.C.*, 747 F.2d 139, 144–45 (3d Cir.1984) ("some but not precise factual correspondence" must exist; officers must "apply general, well developed legal principles").

■ The plaintiffs advance two Fourth Amendment challenges to the defendant's qualified-immunity defense. First, they argue that Det. Valdes did not have a reasonable, good-faith basis to believe that Polk was a prostitute. *See* Opp'n at 14–16. Second, the plaintiffs contend that Det. Valdes's enlistment of a civilian who was unauthorized by law or by the MPD to assist in the performance of police duties vitiates Det. Valdes's claim to qualified immunity. *See id.* at 13. The Supreme Court has instructed that when evaluating a claim of qualified immunity, a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *See Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (citing *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)). If the court determines that the constitutional right was clearly established, it must further inquire whether a reasonable person in the official's position would have known that his conduct would violate that right. With this framework in mind, the court turns to the plaintiffs' Fourth Amendment challenges.

### C. Det. Valdes's Investigatory Stop of the Plaintiffs

### 1. Do the plaintiffs allege an actual violation of clearly established law?

■ The Fourth Amendment to the United States Constitution protects citizens from unreasonable government interference with the right of privacy. *See* U.S. CONST., amend. IV; *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Of course, not every encounter between police officers and citizens implicates the Fourth Amendment. *See Terry v. State of Ohio*, 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As long as the person

is free to walk away, no Fourth Amendment detention occurs if a police officer merely approaches a person in a public place and asks questions. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Indeed, in determining whether a detention has occurred within the meaning of the Fourth Amendment, the Supreme Court has recognized three types of police-citizen encounters: (1) a full-scale arrest, which must be supported by probable cause, *see Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); (2) a brief investigatory detention, which must be supported by reasonable suspicion, *see Terry v. State of Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and (3) a brief police-citizen encounter, which requires no justification, *see Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

█ The parties do not dispute that the incident at issue constituted an investigatory detention. *See* Mot. to Dis. at 7 ("Detective Valdes Reasonably and Lawfully Stopped the Plaintiffs Based on Reasonable Suspicion"); Opp'n at 14 ("Valdes did not have a Reasonable Good–Faith Basis to Believe that Polk was a Prostitute"). Nor do they dispute that under clearly established law, police officers cannot "stop" civilians without reasonable suspicion. *Cf. Terry v. State of Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). They do dispute, however, whether Det. Valdes had reasonable suspicion to stop the plaintiffs, and whether it was objectively reasonable for Det. Valdes to believe that his conduct was lawful. Det. Valdes contends that he had a "particularized and objective" basis for stopping the Plaintiffs. *See* Mot. to Dis. at 8. As he states in his Motion to Dismiss, "[t]he uncontradicted evidence is that Det. Valdes had a description of a prostitute who was a robbery suspect and Plaintiff Polk fit that description. Although the Plaintiffs may have been innocently walking through the lobby of a hotel in which they were guests, their innocent activity was susceptible to differ-

ent interpretations given the totality of the circumstances." *Id.* at 8–9. Yet as the plaintiffs correctly point out, Det. Valdes "does not describe the prostitute or the robbery to which he attempts to link Polk...." Opp'n at 15. Nor does he "articulate the description of the prostitute, the source of the alleged lookout information, what the prostitute was wearing, where the alleged robbery took place... or which, if any, police documents or personnel support the alleged lookout information. He is then somehow able to assert that Polk fits a description in a very general manner of some person and an event he fails to identify." *Id.*

The court is inclined to agree with the plaintiffs on this score. Although the reasonable-suspicion standard as "outlined in *Terry* and its progeny is not onerous," *see Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 813 (6th Cir.1999), it must require something more than the conclusory assertions put forward by Det. Valdes. *See Terry,* 392 U.S. at 27, 88 S.Ct. 1868 (officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'"); *see also McDonell v. Hunter,* 809 F.2d 1302, 1307 (8th Cir.1987) (the defendant must be able to point to "specific, objective facts and rational inferences they are entitled to draw from those facts in light of their experience" to justify the search). If the court were to accept Det. Valdes's statement that Polk matched the description of a robbery suspect, with nothing more, police officers in the future could find refuge in the same explanation every time a detainee challenged the existence of reasonable articulable suspicion.

## 2. Was Det. Valdes's conduct objectively reasonable in light of clearly established law?

The requirement that an official's conduct be objectively reasonable casts a wide net of protection to most officials but does not insulate all official conduct. *See Gruenke v. Seip,* 225 F.3d 290, 301 (3d

Cir.2000) (citing *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727 ("qualified immunity ... provide[s] no license to lawless conduct")). When the defendant violates a clearly established right of which a reasonable person should have known, he is not entitled to qualified immunity. On the other hand, even if the right is clearly established, an official will not be held liable if he was acting reasonably in good faith fulfillment of his responsibilities. *See, e.g., Anderson v. Creighton*, 483 U.S at 638, 107 S.Ct. 3034.

▪ The court is mindful that qualified immunity is an issue that should be decided as a matter of law at the earliest possible stage of a case. *See Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Where the qualified-immunity issue centers on whether a violation of rights has occurred at all, or on whether the rights allegedly invaded were clearly established at the time the alleged violation occurred, the Court is confronted with a pure issue of law that it may resolve at the earliest possible stage of litigation. *See In re City of Philadelphia Litig.*, 49 F.3d 945 (3d Cir.1995). Where, however, the applicability of qualified immunity "turns on the facts known by the public officials at the time of the challenged conduct," and there is a genuine dispute with respect to the existence of such facts or the defendants' knowledge thereof, the issue of qualified immunity is subject to determination by the factfinder at trial. *See Brown v. Stewart*, 910 F.Supp. 1064, 1071 (W.D.Pa.1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

▪ Although the court has decided as a matter of law that based on the record before it, Det. Valdes stopped the plaintiffs without reasonable suspicion, this does not necessarily mean that a jury would conclude that Det. Valdes's conduct was objectively unreasonable. Significantly, the current record reveals factual disputes between the parties regarding the purpose of Det. Valdes's entry into the hotel that

evening, the existence of a police report describing a prostitute that resembled Polk, and a number of other details. These disputes bear directly on whether it was objectively reasonable for Det. Valdes to believe he was acting lawfully. Accordingly, the court rules that the factfinder should decide whether it was objectively reasonable for Det. Valdes to believe that he did not violate the plaintiffs' rights. *Cf. Calamia v. City of New York*, 879 F.2d 1025 (2d Cir.1989) (because disputed facts affected determination of objective reasonableness, question of whether arresting officer would receive qualified immunity was question for jury).

## D. Det. Valdes's Use of a Civilian Ride-along to Effectuate the Stop

### 1. Have the plaintiffs alleged the deprivation of an actual constitutional right?

▪ The more problematic issue raised by the plaintiffs concerns Det. Valdes's enlistment of a civilian to effectuate the stop. In some respects, the plaintiffs' challenge to Det. Valdes's actions seems to be a matter of first impression. The D.C. Circuit has not previously considered whether the specific acts described by the allegations in this case amount to an unreasonable stop or seizure. Nevertheless, this court recognizes that the Fourth Amendment's proscription of unreasonable search and seizures ensures reasonableness in the scope *and* manner of searches and seizures. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("the 'reasonableness' of a particular seizure depends not only on when it is made, but also on *how* it is carried out") (emphasis added) (citation omitted).

▪ In *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), the Supreme Court considered this proposition in the context of a "media ride-along," the practice by which police officers bring members of the media into private homes to observe and record the execution of

warrants. The Court ruled unanimously that police facilitation of press photography during an otherwise lawful search of a private home rendered the search unreasonable. *See id.* *Wilson v. Layne* stands for two important Fourth Amendment principles that bear on the instant case. First, the reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out. Second, the reasonableness of the police's actions in conducting a search or seizure must be judged, in part, by assessing the degree to which those actions further the legitimate law enforcement principles behind the search or seizure. *See Wilson,* 526 U.S. at 611, 119 S.Ct. 1692 (quoting *Maryland v. Garrison,* 480 U.S. 79, 87, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) ("the purposes justifying a police search strictly limit the permissible extent of the search")).

### a. Was the stop conducted in a reasonable manner?

 With respect to the first of these Fourth Amendment principles—that searches must be conducted in a reasonable *manner*—the court holds that the enlistment of an unauthorized civilian to assist in a *Terry* stop intruded upon interests protected by the Fourth Amendment. The present case differs from *Wilson v. Layne* in that the latter involved a search in a person's home, where one's expectation of privacy is at its highest. *See* 526 U.S. at 610–12, 119 S.Ct. 1692. Nevertheless, the Court's holding did not turn solely on the sanctity of the home. As the Second Circuit has explained, "Fourth Amendment jurisprudence ... has declined

to set spatial boundaries on the rights protected by that amendment. For as the Supreme Court has famously stated, 'the Fourth Amendment protects people, not places.'" *Lauro v. Charles,* 219 F.3d 202, 211 (2d Cir.2000) (citing *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

In applying these Fourth Amendment principles to the "stop and frisk" of a person on a public street, the Supreme Court recognized the intrusion on dignitary and privacy interests when the police physically handle a person. "[S]uch a procedure performed in public by a policeman while the citizen stands helpless ... is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry,* 392 U.S. at 16–17, 88 S.Ct. 1868. Indeed, it may well have been indignity and resentment that led the plaintiffs to file this suit. The plaintiffs' claims, if proved, are arguably even more egregious than the media ride-along held unconstitutional in *Wilson v. Layne.* The police officers in *Wilson* did not deliberately misrepresent the media to be law-enforcement personnel, nor did they falsely cloak the media personnel in police power.

To an innocent private citizen, there are few things more frightening than the realization that a police officer has the power to deprive him of his freedom. Yet when a police officer dresses an unauthorized person in the authority to deprive another of his freedom, he diminishes society's trust in law enforcement[11] and undermines the government's ability to protect citizens from unreasonable governmental intrusion. In 1949, Justice Robert Jackson, writing

---

11. The D.C. Circuit has written that "in some police-citizen encounters, a person's awareness of the duties of police officers to apprehend criminals, keep the peace, and prevent crime, 'coupled with feelings of civic duty, moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate with law enforcement officers.'" *United*

*States v. Winston,* 892 F.2d 112, 116 (D.C.Cir. 1989) (citing *Gomez v. Turner,* 672 F.2d 134, 141–42 (D.C.Cir.1982) (footnote omitted)). If officers were permitted to delegate their authority to unauthorized civilians, a reasonable person might have less incentive to cooperate with law-enforcement officers.

under the weight of his experiences at Nuremberg, Germany,[12] depicted the degradation of a people subjected to uncontrolled search and seizure:

> These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivation of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the *human personality deteriorates and dignity and self-reliance disappear* where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

*Brinegar v. United States,* 338 U.S. 160, 180–81, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting) (emphasis added). Because the right to be secure against searches and seizures is one of the most difficult to protect, *see id.,* the authority we concede to an officer to conduct a search or seizure must be closely guarded. For Det. Valdes to delegate this guarded authority to Aponte seriously undermines society's ability to defend individual liberty and protect against unreasonable search and seizure.

Heeding the Supreme Court's admonition that a stop must be reasonable in manner as well as in scope, the court holds that Det. Valdes's use of Aponte exacerbated the impropriety of the seizure that occurred when he stopped the plaintiffs. *Cf. Lauro v. Charles,* 219 F.3d 202, 211 (2d Cir.2000) (staged "perp walk," whereby police parade arrestee for the benefit of the press, unreasonably exacerbates seizure of arrestee and therefore violates the Fourth Amendment).

b. *Was the stop related to a legitimate public purpose?*

Despite the indignation the plaintiffs experienced, Det. Valdes's use of an unauthorized civilian might have been reasonable under the Fourth Amendment had it been sufficiently related to a legitimate government objective. *Cf. Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *Terry,* 392 U.S. at 20–21, 88 S.Ct. 1868. In *Wilson,* the defendants asserted three justifications for the media ride-along: (1) the officers should have the discretion to decide when a media presence would further the mission of law enforcement; (2) accurate reporting on law-enforcement activities was a significant interest; and (3) the presence of the media could deter law-enforcement abuses. *See Wilson,* 526 U.S. at 612–13, 119 S.Ct. 1692. The Court found that none of these justifications overcame the Wilsons' Fourth Amendment rights. "Were such generalized 'law enforcement objectives' themselves sufficient to trump the Fourth Amendment, the protections guaranteed by that Amendment's text would be significantly watered down." *Id.*

Unlike the defendants in *Wilson,* Det. Valdes offers no justification for his use of a civilian ride-along.[13] Although the court

---

12. On May 2, 1945, President Truman appointed Justice Jackson to be United States Chief Counsel for redressing Nazi crimes. *See* Henry T. King, Jr., *Robert Jackson's Visions for Justice and other Reflections of a Nuremberg Prosecutor,* 88 Geo. L.J. 2421, 2423 (August 2000). Justice Jackson penned his dissent in *Brinegar* three years after returning from Nuremberg.

13. To the contrary, on the record as it currently stands, Det. Valdes's actions are troubling in several respects. By utilizing an untrained civilian to effectuate a stop of a robbery suspect, Det. Valdes placed both the plaintiffs and Aponte at risk for physical harm. There is no evidence that Aponte is trained in police practices, and in particular in handling suspects. According to the plaintiff's allegations, Aponte detained Bell behind an imaginary line, and instructed him not to move. Recognizing that law enforcement is a necessarily dangerous activity, the court is loathe to imagine what might

can conceive of occasions when there might be a public purpose to having a civilian ride-along, it is more difficult to conceive how it would serve a legitimate public purpose to falsely cloak a civilian in police authority, and then enlist that civilian to effectuate a stop.[14] Accordingly, the court holds that based on the facts as alleged, the manner in which Det. Valdes stopped the plaintiffs was unreasonable and was not related to a legitimate government objective.

## 2. Did Det. Valdes's Conduct Violate a Clearly Established Constitutional Right?

Although Det. Valdes's enlistment of Aponte in effectuating a stop violated the Fourth Amendment, Det. Valdes nevertheless may be entitled to qualified immunity if the right he allegedly violated was not "clearly established" at the time the violation occurred. In the context of a Fourth Amendment *Terry* stop, it is clear that the right to be free from detention except on reasonable suspicion or probable cause was clearly established at the time of the stop. The court's task is to determine whether law at that time clearly established a right to be free from detention by a civilian who has been falsely cloaked in police power.

The D.C. Circuit has written that "the precise contours of what constitutes 'clearly established law' for immunity purposes are difficult to delimit, and the Supreme Court has offered little guidance in this regard." *Zweibon v. Mitchell*, 720 F.2d 162, 168–69 (D.C.Cir.1983) (citation omitted), *cert. denied*, 469 U.S. 880, 105

S.Ct. 244, 83 L.Ed.2d 182 (1984). The Supreme Court has made clear, however, that something more than the existence of general legal principles is necessary to show that the controlling legal doctrine was "clearly established." *See* Rudovsky at 45 (summarizing the Court's holdings in *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), and *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). At the same time, it is not necessary that "the very action in question has previously been held unlawful, or that the plaintiff point to a previous case that differs only trivially from his case." *See K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir.1990).

The most pertinent of the recent Supreme Court cases addressing "clearly established law" arose not in the context of a Section 1983 suit but rather in a proceeding under Section 1983's criminal analogue, 18 U.S.C. § 242.[15] In *United States v. Lanier*, the federal government prosecuted a state-court judge on charges of sexually assaulting a woman in his chambers. *See* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Stressing the absence of a prior decision on point, the Sixth Circuit struck down the judge's conviction on the grounds that it was not clearly established that sexual assault was a violation of constitutional rights of which a reasonable officer should know. *See United States v. Lanier*, 73 F.3d 1380, 1392–94 (6th Cir. 1996), *vacated*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

The Supreme Court overturned the Sixth Circuit's ruling and held that a right

---

have happened had Bell attempted to resist arrest.

14. Lest there be any uncertainty, the court confines its holding to the enlistment of an unauthorized civilian ride-along in the stop of a civilian. The court does not hold that the presence of a civilian or the practice of civilian ride-alongs always and everywhere violates the Fourth Amendment.

15. Section 242 establishes criminal liability for willful violations of constitutional rights.

In defining the level of specificity required to fulfill the due-process requirement of "fair warning," the *Lanier* Court equated the Section 242 standard with the "clearly established" standard under qualified immunity law. *See Lanier*, 520 U.S. at 270–71, 117 S.Ct. 1219. "[T]he qualified immunity test is simply the adaptation of the fair warning standard to give officials ... the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague statutes." *Id.*

can be clearly established even though there is no prior decision expressly declaring it. *See id.* According to the Court, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Id.* at 271 (brackets in original) (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). As the Court explained: "The easiest cases don't even arise. There has never been ... a Section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose the officials would be immune from damages." *Id.* (citing *United States v. Lanier,* 73 F.3d at 1410 (Daughtery, J., dissenting)).

Although no reported case has addressed the precise conduct at issue here, *Lanier* indicates that the law nonetheless may be "clearly established" if general statements of Fourth Amendment law gave fair and clear warning to Det. Valdes that he could not delegate his authority to detain a suspect. One such statement of Fourth Amendment law appears in the Supreme Court's declaration that "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California,* 496 U.S.

128, 140, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

The Sixth Circuit addressed this proposition in a case involving civilian assistance during the execution of a search warrant. *See Bills v. Aseltine,* 958 F.2d 697 (6th Cir.1992). In *Bills,* law enforcement officials executing a search warrant for a generator invited a security guard from General Motors to accompany them to identify stolen General Motors property not mentioned in the warrant. *See Bills,* 958 F.2d at 700. Framing the "critical question" in the case as "whether the police officers engaged in any constitutionally unreasonable act in permitting or facilitating the security officer's presence in the plaintiff's home,"*id.* at 704, the court stated:

> Officers ... may ... exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises. The warrant in this case implicitly authorized the police officers to control and secure the premises during their search for a generator. It did not implicitly authorize them to invite a private security officer to tour plaintiff's home for the purpose of finding General Motors property.

*Id.*Accordingly, the court held that whether the officers' actions unreasonably exceeded the scope of the warrant was a question for the jury, and the lower court should not have granted summary judgment to the defendants. *See id.* at 705.[16]

---

**16.** On the issue of whether the officers enjoyed qualified immunity from suit for allowing private citizens to assist them, the court did not discuss whether "clearly established law" forbade their actions. Rather, the court held that it was not objectively unreasonable for police to call upon private citizens to assist them, "and where assistance is rendered *in aid of a warrant,* and not for some other purpose, the bounds of reasonableness have not been overstepped." *See Bills,* 958 F.2d at 706.

For the purposes of the instant case, it is significant that the Sixth Circuit decided in

1992 that the officers' actions may have been improper. The events giving rise to the instant case occurred in 1997. The Sixth's Circuit's decision thus serves to warn officers about the propriety of bringing private citizens along in the execution of search warrants. Moreover, in *Bills,* the General Motors security officer arguably was acting "in assistance" of the police officer in the identification of property identified in the search warrant. *See id.* at 706. Det. Valdes does not argue that he required Aponte's assistance in any such way.

Indeed, the instances in which courts have permitted civilians to accompany a government agent to the scene of a search, or even participate in the execution of a search warrant, bear little resemblance to the instant case. For example, the courts have permitted civilians to assist in searches where the civilians possess special expertise in a certain field and the items to be seized are complex or exceptional in nature. *See, e.g., United States v. Schwimmer,* 692 F.Supp. 119 (E.D.N.Y. 1988) (warranted search not rendered unlawful by participation of computer expert, where warrant specifically provided that federal agents were permitted to procure the assistance of a civilian computer expert in order to use and operate computer terminals at the site of the search). Similarly, where the civilian participating in the execution of the search warrant is the victim of a theft who is able to point out his stolen property, courts have unanimously held that the civilian's presence did not affect the propriety of the search. *See, e.g., United States v. Robertson,* 21 F.3d 1030 (10th Cir.1994) (participation of crime victim in execution of search warrant was lawful where victim had been carjacked, and after federal agents discovered his car, victim described four items that he knew were missing from the car). Courts have also held that police officers may allow relatives or employees of the victim to participate in the execution of a search warrant. *See, e.g., United States v. Clouston,* 623 F.2d 485 (6th Cir.1980) (presence of employees of telephone company from which equipment had been stolen did not render warranted search unconstitutional where employees' role was limited to identifying property stolen from their employer).

▮ These cases suggest that the circumstances under which a civilian may accompany a police officer in the execution of a search warrant (and by extension, an investigatory stop) are critical. Thus, where officers allowed a private security guard into the owner's home to search for items stolen from his employer, but not mentioned in the search warrant, the officers may have violated the homeowner's Fourth Amendment rights. *See Buonocore v. Harris,* 65 F.3d 347 (4th Cir.1995). Det. Valdes's actions present no circumstances that might allow a court to accept the presence of a civilian. According to the alleged facts, there was no legitimate purpose to having Aponte identify himself as a police officer and force Bell to remain within a fixed area while Det. Valdes questioned Ms. Polk.

The court is also troubled by the fact that Det. Valdes's conduct involved not a mistaken interpretation of the law, but an *active deception* of the plaintiffs. For this reason, the instant case is distinguishable from *Wilson v. Layne,* which involved no such deception. In fact, the *Wilson* Court based its ruling in part on the fact that the officers had relied on a policy of the Marshal's Service that "explicitly contemplated that media who engaged in ride-alongs might enter private homes." *See Wilson,* 526 U.S. at 617, 119 S.Ct. 1692. The Supreme Court ruled that it was not unreasonable for the officers to rely on a formal policy of their department. *See id.* In contrast, Det. Valdes's actions were in direct violation of MPD policy, which requires civilians to receive approval before they accompany a police officer on a tour of duty. *See* Inves. Rep. at 5. Moreover, MPD officers are required to check that the civilian has received this approval before allowing the civilian in the police car. None of these things occurred here. *See id.*

In both *Davis v. Scherer* and *Mitchell v. Forsyth,* the Supreme Court's holdings that the law was not clearly established turned on the fact that there was an "open question" whether the Constitution outlawed the conduct at issue. *See Forsyth,* 472 U.S. at 535, 105 S.Ct. 2806; *see also Davis,* 468 U.S. at 192, 104 S.Ct. 3012. In the instant case, there can be little doubt that the Constitution forbids police officers to share their authority to conduct

searches and seizures with unauthorized civilians. The purpose of the qualified-immunity defense is to relieve officers of the burden of anticipating developments in constitutional law at every turn. It may be unfair to impose liability on a public official who makes a "mistake in judgment," such as believing probable cause is present when it is not, or who fails to "anticipate subsequent legal developments," such as whether due process requires a pretermination hearing (as in *Davis*). By contrast, the Supreme Court has recognized that "it is not unfair to hold liable the official who knows or should know that he is acting outside the law." *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Thus, in *Lanier*, it was not "unfair" to hold the state judge liable when he sexually assaulted a woman in his chambers. The court determines that it would not be unfair to hold Det. Valdes liable for allegedly deceiving the plaintiffs into believing his companion was an officer, and having perpetuated this fraud, allowing the civilian to detain one of the plaintiffs.

### 3. Was Det. Valdes's conduct objectively reasonable in light of clearly established law?

In support of his claim that he acted in an objectively reasonable manner toward the plaintiffs, Det. Valdes states that he was "conducting a criminal investigation, as is his duty. In the course of such investigations ... Det. Valdes has a right to institute a stop of the Plaintiffs." *See* Mot. to Dis. at 11. But as the court has just held, Det. Valdes did not have a right to share the power of his badge with an unauthorized civilian in order to effectuate a stop. Det. Valdes has put forth no facts suggesting that a reasonable police officer would have believed that the Fourth Amendment permitted such actions.

The court therefore concludes that (i) the Fourth Amendment's prohibition on unreasonable searches forbade Det. Valdes's actions in deceptively allowing Aponte to stop and detain the plaintiffs; (ii) the right of the plaintiffs to be protected under the Fourth Amendment from an officer using a civilian to impose such authority upon them was "clearly established" at the time of the search, and (iii) it was not objectively reasonable for Det. Valdes to believe that his actions were consistent with the Fourth Amendment.

## V. THE PLAINTIFFS' COMMON LAW CLAIMS

Det. Valdes argues that the plaintiffs' claims of battery, false arrest, and false imprisonment must be dismissed as untimely, and that their allegations of false arrest and false imprisonment fail to state a claim upon which relief can be granted. The plaintiffs have failed to respond to Det. Valdes's arguments with respect to these claims. Although the court has the discretion to treat these arguments as conceded,[17] the court will allow the plaintiffs to oppose these claims, and the defendant to reply thereto. At this early stage of litigation, the court does not wish to punish the plaintiffs for counsel's inexplicable failure to respond to arguments that could dispose of large portions of the case.

## VI. CONCLUSION

For the foregoing reasons, the court will deny defendant Det. Valdes's motion to dismiss on the ground of qualified immunity. Specifically, the court holds that Det. Valdes does not enjoy qualified immunity with respect to his enlistment of an unauthorized civilian ride-along to effectuate a stop of the plaintiffs. Moreover, on the record as it currently stands, the court cannot determine whether Det. Valdes enjoys qualified immunity with respect to the initial stop of the plaintiffs. Finally, at

---

**17.** Under the Rules of this court, "an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion. If such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded." LCvR 7.1(b).

72

this time the court will not rule on Det. Valdes's motion to dismiss the plaintiffs' common-law claims. Instead, the court will set the parties on a briefing schedule, and will rule on the motion thereafter. **SO ORDERED.**